NOTICE
Decision filed 04/25/23. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2023 IL App (5th) 220793

NOS. 5-22-0793, 5-22-0794 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* Za. G. and Zy. G., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 19-JA-330, 19-JA-331 |
| | ) | |
| Deandria G., | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| Respondent-Appellant). | ) | Judge, presiding |

JUSTICE McHANEY delivered the judgment of the court, with opinion.
Justices Welch and Vaughan concurred in the judgment and opinion.

**OPINION**

¶ 1 Deandria G. is the mother of twins, Za. G. and Zy. G., who had been exposed during gestation to marijuana. Deandria had previous involvement with the Department of Children and Family Services (DCFS) dating back to 2016, when her parental rights to four children were terminated. Due to these concerns, DCFS took protective custody of the twins in this case.

¶ 2 During the three years of this case, Deandria successfully completed all programs and services mandated by DCFS, with the exception of her failure to show for the majority of the mandated random drug tests. Ultimately, Deandria's continued use of marijuana and resulting failure to comply with the drug-testing aspect of her service plan led to the petitions seeking to have her declared an unfit parent and to have her parental rights terminated.

1

I. BACKGROUND

¶ 4     Za. G. is a male child and Zy. G. is a female child. Both were born on October 28, 2019. Their mother is Deandria. The father is Daniel B.[1] On October 29, 2019, a report was made with DCFS. Deandria had reported prior DCFS involvement with her other four children who were no longer in her care. She stated that her parental rights had been terminated in 2016 because she did not want to comply with the classes mandated by her caseworker. The four children were removed from Deandria's care in 2014. Deandria informed hospital staff that she had used marijuana for the first six months of the twins' pregnancy. Deandria had tested positive for marijuana,[2] and the hospital had collected and sent umbilical cord blood samples for toxicology testing. However, the twins were not exhibiting withdrawal symptoms. On October 31, 2019, DCFS took protective custody of the twins.

¶ 5     On November 4, 2019, the State filed a petition for adjudication of wardship. The petition alleged that Za. G. and Zy. G. were neglected in that they were not receiving the proper or necessary support or education as required by law and also were not receiving medical or remedial care mandated by Illinois law and required for their well-being (705 ILCS 405/2-3(1)(a) (West 2018)); that Za. G. and Zy. G. were neglected in that they were in an environment injurious to their welfare (*id.* § 2-3(1)(b)); and that Za. G. and Zy. G. were abused in that Deandria created a substantial risk of physical injury to the twins by other than accidental means that would likely cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function because Deandria had not completed services in a prior DCFS case involving four other children and had her parental rights terminated and because Deandria had unresolved

---

[1]Daniel B. is not part of this case on appeal.

[2]The record does not contain a date of Deandria's positive drug test, and thus we do not know if the test was conducted as part of her prenatal care or if the test was conducted while she was hospitalized for the delivery of the twins.

substance abuse and mental health issues (*id.* § 2-3(2)(ii)). On November 4, 2019, the court held the shelter care hearing. Deandria was present. The court found that there was probable cause for filing the petition because Deandria's rights had been terminated as to the other four children.[3] The court then found that there was an immediate and urgent necessity to remove Za. G. and Zy. G. from the home and granted temporary custody of the twins to DCFS. The court also directed DCFS to allow Deandria to have supervised visitation with her children.

¶ 6    The adjudicatory hearing was held on December 4, 2019. Deandria stipulated to the allegations of count I of the adjudicatory petition—that Za. G. and Zy. G. were neglected in that they were not receiving the proper or necessary support or education and were not receiving medical or remedial care mandated by Illinois law and required for their well-being (*id.* § 2-3(1)(a))—and the court entered its order making that finding. The State dismissed the other two counts. The trial court admonished Deandria to cooperate with DCFS to correct the conditions that required Za. G. and Zy. G. to be removed from her care or risk termination of her parental rights.

¶ 7    DCFS filed its dispositional report on December 30, 2019. Deandria was 29 years old and living with her sister in Decatur. She reported that she received social security disability benefits "her whole life" but did not know why. DCFS noted that Deandria may have developmental delays. DCFS noted that Deandria's other four children had been adopted by her mother. DCFS expressed its concern that Deandria did not seem to understand why her twins came into DCFS care and was unwilling to take responsibility for her actions. More specifically, Deandria lacked understanding that her marijuana usage during pregnancy could have had a negative effect on her children. DCFS completed its integrated assessment on December 5, 2019, and determined that Deandria needed

---

[3]The trial court's order mistakenly indicates that Deandria's parental rights had been terminated as to three, instead of four, children.

substance abuse treatment, a psychological assessment, individual psychotherapy, and parenting classes. By the date of the report, Deandria had completed both the substance abuse and mental health assessments. She was then engaged in substance abuse treatment six days per week for one hour each day. She reported that she had abstained from marijuana since October 31, 2019. DCFS planned to send Deandria for weekly random drug tests. Supervised visits were going well and DCFS noted that Deandria was consistent, provided the proper supplies during visits, and acted in a loving and appropriate way with the children. DCFS had assigned a caseworker at Heritage Behavioral Health Center (Heritage) in Decatur to work with Deandria to find stable housing and employment. DCFS reported that Deandria was "involved and cooperative" thus far in this case.

¶ 8       The trial court held the dispositional hearing on January 15, 2020. Deandria was found to be unfit and unable to care for, protect, train, educate, supervise, or discipline the minors and placement with her would be contrary to the minors' health, safety, and best interest.

¶ 9       DCFS filed a status hearing report with the court on June 30, 2020. Visits with the children were switched to virtual due to COVID-19. The pandemic also resulted in a cessation of random drug testing from March 2020 until June 2020. The two tests in March 2020 were positive for marijuana (March 5, 2020, and March 13, 2020). Deandria tested positive for marijuana when testing resumed on June 15, 2020. Status reports relative to Deandria's services reflected consistent progress. The caseworker could not confirm whether Deandria was then employed. DCFS recommended that the goal remain to return the twins home to Deandria within 12 months. On July 1, 2020, the trial court entered its permanency order maintaining the permanency goal within 12 months.

¶ 10     On August 12, 2020, Deandria filed a motion asking the trial court to allow extended visitation with the children. The agency supervising Deandria's visits, Primed for Life, Inc.,

supported extended visitation to allow for further development of the relationship. The motion was granted on August 26, 2020, to allow Deandria to have two 2-hour supervised visits with her children each week.

¶ 11     DCFS filed its next status report on December 28, 2020, which covered the period of July 1, 2020, through December 30, 2020. DCFS reported that Deandria remained uncooperative with random drug tests and substance abuse counseling. During the six-month reporting period, DCFS had asked Deandria to have 29 random drug tests. Deandria had only reported for 2 of the 29 requested tests, and the results of the 2 completed tests were positive for marijuana. Deandria was allegedly not being truthful with her substance abuse provider at Heritage, advising him or her that she had been drug-free since November 2019. The caseworker informed the substance abuse counselor that despite Deandria's claims, she continued to test positive when she reported for a random drug test. As of the date of the report, Deandria was employed at a local motel. DCFS asked the court to maintain Za. G. and Zy. G. as wards of the court and to maintain the permanency goal of returning the twins home within 12 months. The trial court entered its order on December 30, 2020, maintaining the permanency goal because Deandria had not been compliant with drug testing and not forthcoming with her caseworker.

¶ 12     DCFS filed its next status report in May 2021, covering the time period of December 30, 2020, to April 30, 2021. In March 2021, Deandria was discharged unsatisfactorily from parenting classes. Additionally, Deandria remained inconsistent with required random drug tests. DCFS requested 18 random drug tests during this four-month period. Deandria completed 6 of the 18 tests. Five of the tests were positive for marijuana, but the most recent drug test was negative. Heritage concluded that Deandria no longer needed mental health or substance abuse counseling and discharged her. DCFS asked the court to maintain the permanency goal of returning Za. G.

and Zy. G. home within 12 months. The court held the permanency hearing on June 30, 2021, and maintained that goal.

¶ 13    DCFS filed its next status report on December 20, 2021. Deandria's children were in the foster care of her mother and sister. Her mother asked the agency assigned by DCFS on this case, the Center for Youth and Family Solutions, to supervise Deandria's visits. This began in October 2021, but Deandria only attended two visits, having cancelled or being unavailable when agency staff arrived at her mother's home. However, the caseworker stated that she had observed Deandria in her mother's home when the worker performed monthly home visits. The caseworker opined that Deandria was still visiting the twins outside of the supervised visitation schedule. Moreover, Deandria remained uncooperative with random drug tests. During the period of the report—June 23, 2021, to December 15, 2021—Deandria failed to appear for 12 random drug tests and was positive on 4 tests. The caseworker also noted the levels of marijuana reported on these positive tests. Test results of less than five milligrams for marijuana would not be considered a positive test result. On August 18, 2021, the test result reflected a level of 40 milligrams. On August 30, 2021, the test result reflected a level of 50 milligrams. On October 13, 2021, the test result reflected a level of 36 milligrams. Finally, the November 5, 2021, test was positive for opiates and also reflected a marijuana level of 628 milligrams. Deandria had completed mental health and substance abuse services and had been readmitted and completed parenting services. The caseworker's overall assessment was that the goal for return home within 12 months was unsatisfactory. Despite the completion of services, Deandria's substance abuse remained a concern. The caseworker stated that Deandria relied upon her mother and sister to actually parent the children; however, the caseworker noted that she had not had a recent opportunity to observe Deandria during supervised visits as Deandria had not been participating. The caseworker

6

acknowledged that Deandria was cooperative and open but that she struggled to understand how her substance abuse behaviors impacted the well-being and safety of the twins. The court entered its permanency order on December 22, 2021, finding that the appropriate permanency goal was substitute care pending a determination of termination of Deandria's parental rights.

¶ 14 On May 26, 2022, DCFS filed its next permanency report with the court. Deandria was employed as of the date of the report. The twins were now in the care of her sister, and her sister supervised Deandria's weekly visits. Deandria remained uncooperative with her required random drug tests. Services were complete. The twins were moved to the home of Deandria's sister in April 2022. Deandria's mother had adopted Deandria's four older children and reported to DCFS that having all six children in the home was too much for her to handle. Deandria's sister had indicated her willingness to have guardianship of, or possibly adopt, the twins.

¶ 15 On June 7, 2022, the guardian *ad litem* (GAL) for the children filed his motion seeking to find Deandria an unfit parent and to terminate her parental rights to Za. G. and Zy. G. The GAL alleged that Deandria was unfit because she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of Za. G. and Zy. G.; (2) failed to make reasonable efforts to correct the conditions that were the basis of the removal of the minor during any nine-month period; and (3) failed to make reasonable progress toward the return of the minor to her within nine months after an adjudication of neglect, citing the time periods of December 5, 2019, to September 5, 2020, September 5, 2020, to June 5, 2021, June 5, 2021, to March 5, 2022, and September 7, 2021, to June 7, 2022.

¶ 16 The trial court entered its next permanency order on June 8, 2022, again finding that the permanency goal should be substitute care pending a determination of termination of parental

rights. The court selected that goal because Deandria continued to not comply with the random drug tests required and thus had not made progress.

¶ 17   The fitness hearing was held on October 26, 2022. The State called two witnesses and Deandria testified on her own behalf.

¶ 18   Jasmine Kaylor, the director for the homeless prevention and support services at Heritage, testified that Deandria had been enrolled in Heritage's housing program and substance abuse services for almost two years. Kaylor testified that Deandria had been successfully discharged from both Heritage programs.

¶ 19   Megan Lucas, a lead caseworker at the Center for Youth and Family Solutions, began working with Deandria and the children in July 2021 but was familiar with the entire case file. Lucas testified that Za. G. and Zy. G. were initially brought into DCFS care because they were both exposed to a high level of marijuana at birth and because DCFS had been involved with Deandria and her four older children that resulted in termination of her parental rights. The agency referred Deandria for substance and mental health counseling, parenting classes, and supervised visitation. Deandria successfully completed all services. However, because the children came into care partly because of Deandria's substance abuse, the agency required her to submit to random drug tests. Over the course of the three years since the children were born, Deandria had been referred for testing 104 times but had completed only 23 tests. Of the 23 tests Deandria completed, 10 were positive. Two of the positive tests were positive for marijuana and opiates. Lucas testified that Deandria did not provide any evidence of a narcotics prescription to possibly account for the opiate positivity.[4] All remaining positive tests were positive only for marijuana. The tests ordered

_____

[4]In the best interest report filed by DCFS in this case, the dates of the opiate positive tests were listed. The two positive tests were not close in time. The first time Deandria tested positive for opiates was on December 9, 2020. Deandria tested positive for opiates again on November 5, 2021.

by DCFS quantified the levels of marijuana present in Deandria's system. Although there was no expert or layperson testimony about the levels and how that translated to intoxication, Lucas testified that the threshold for a positive test result was a 5, and that the lowest test result Deandria had was a 17, with one at 428 and another at 628.

¶ 20 Lucas testified that she asked Deandria why she failed to show for these random drug tests. Deandria stated that the reason she missed the tests involved her work schedule. However, Deandria had only recently, in July 2022, begun a steady job. Overall, Lucas testified that she had no idea whether Deandria was a sober parent. She had suggested that Deandria find a physician to prescribe her medical marijuana, as Lucas believed that she could be better monitored with a physician involved. Deandria did not do this. Lucas's concern for the twins was that, with the history of high levels of marijuana being used, Deandria could place them in danger. She stated that although Deandria completed all services, DCFS never felt that allowing unsupervised visits was appropriate or safe. Although Lucas testified that she could not tell Deandria that she had to stop using marijuana because of its legalization, she repeatedly reminded her to be attentive to completing all ordered random drug tests.

¶ 21 Deandria testified that the opiates had been prescribed in November 2021, when she underwent a tubal ligation. She stated that her inconsistency with the random drug tests was caused by a lack of transportation. She testified that she still did not have a reliable form of transportation at that time. She also testified that she had asked Lucas for assistance with transportation for her drug tests. However, she had her own vehicle between May and November 2021, and was not then employed, but still did not comply with the random drug tests. When the State asked her why she did not comply with the drug tests during those months, Deandria replied, "Just out doing what I wanted to do at that time." She acknowledged that Lucas had spoken to her about concerns with

her marijuana usage. She said that she did not do those tests because "[t]hat was just my mindset at that time."

¶ 22　The trial court asked Deandria how much marijuana she was currently using. Deandria admitted to daily usage, stating that she smoked "just a blunt a day." She told the court that she could stop smoking, but had not: "there's just no reason why I haven't stopped. It's something to ease my mind." The court asked Deandria if she wanted to get her twins back, and Deandria said that she wanted to have a chance with her babies. Deandria admitted that she was aware that taking the random drug tests was required to get her babies back and that she had no reasons for not taking the tests.

¶ 23　In argument, the State acknowledged that the facts of this case were sad. However, the State argued that although marijuana and alcohol were legal in certain amounts, high levels of either substance impair judgments and response times. The State concluded by suggesting that the situation presented a potential tragedy. The GAL argued that with so many tests not taken, there was really no way to prove that the only drug Deandria was using was marijuana. As the twins had been in DCFS care for almost three years, the GAL asked the court to find Deandria unfit.

¶ 24　The court said that marijuana usage had been the issue from the case's inception, noting that the case began with the twins testing positive at birth to high levels of marijuana. As Deandria only showed for less than 20% of the ordered random drug tests, she had never been provided with the opportunity to have visits with her babies on an unsupervised basis. The court stated that although Deandria wanted her twins returned home to her, she had no excuse for skipping the drug tests. In addition, the court found that Deandria knew that she had to complete the drug tests or risk not getting her children back. The court said that there was no one saying that she could not have any marijuana in her system, but that given her failure to comply with the ordered drug tests,

10

the court had no proof that her levels were going down. The court found that Deandria did not have a reasonable degree of interest, concern, or responsibility about the welfare of her children because she chose not to comply with the mandated tests. The court found that the State had established all allegations of its petition by clear and convincing evidence.

¶ 25    On November 22, 2022, DCFS filed its best interest report. The twins were healthy and had just celebrated their third birthdays. Za. G. and Zy. G. maintained a close relationship with their older four siblings and with their maternal cousins. The twins were scheduled for enrollment in a local Head Start program in 2023. Za. G. and Zy. G. had been living with their maternal aunt since May 2022, who is committed to their well-being and willing to adopt to provide the children with a permanent and loving home.

¶ 26    The court held the best interest hearing on November 29, 2022. The only witness to testify was Lucas, the lead caseworker at the Center for Youth and Family Solutions. Lucas testified that Za. G. and Zy. G. were placed with Deandria's sister, Kadeeja G. in April 2022. She was committed to adopting both children. Neither child had any special needs. The children were socialized and maintained a relationship with Deandria. Lucas testified that she believed it was in the best interest of the children to terminate Deandria's parental rights. Although Kadeeja had only had Za. G. and Zy. G. in her home since earlier that year, she had been involved coparenting the children since birth. Before moving in with Kadeeja, Za. G. and Zy. G. lived with Deandria's mother and their four siblings, previously adopted by Deandria's mother. Lucas stated that Kadeeja had four of her own children[5] and that Za. G. and Zy. G. were bonded with her children as well. Given the number of children in that household, Lucas testified that at times Kadeeja struggled,

_____

[5]Deandria corrected caseworker Lucas's testimony, stating that her sister Kadeeja had only three, not four, of her own children.

11

but that maintaining the relationship with Deandria was with the purpose of having assistance with the twins. Lucas testified that although Kadeeja intended to have Deandria help with the children, Kadeeja was very aware of the issues with Deandria's excessive marijuana usage.

¶ 27    At the conclusion of the hearing, the trial court stated that Za. G. and Zy. G. had a need for permanence and stability and that their current placement with Kadeeja satisfied their needs. The court also noted that the children continued to have contact with their maternal grandmother who cared for them until they recently moved in with Kadeeja. The court found that it was in the best interest of the children, by a preponderance of the evidence, to terminate Deandria's parental rights. On this date, the court entered its written order changing the permanency goal to adoption.

¶ 28                                    II. ANALYSIS

¶ 29    Deandria appeals from the trial court's orders finding that she was an unfit parent and terminating her parental rights.

¶ 30    The legal authority for the involuntary termination of parental rights in Illinois is found in the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) and in the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010) (citing *In re E.B.*, 231 Ill. 2d 459, 463 (2008)). The procedural basis for the involuntary termination of parental rights is found in section 2-29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2020)). The procedure involves two steps. With step one, the State must prove, by clear and convincing evidence, that the parent is an "unfit person" as defined by the Adoption Act. *Id.*; 750 ILCS 50/1(D) (West 2020); *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994). If the trial court finds that the parent is unfit, the process moves to step two, where the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. 705 ILCS 405/2-29(2) (West 2020); *In re J.L.*, 236 Ill. 2d at 337-38.

12

¶ 31    On appeal from a trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the reviewing court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). The trial court's finding of unfitness is given great deference because the court had the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented. *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28 (citing *In re Joseph M.*, 398 Ill. App. 3d 1086, 1089 (2010)); *In re S.R.*, 326 Ill. App. 3d 356, 360-61 (2001).

¶ 32                                          A. Fitness

¶ 33    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Deandria was an "unfit person." The trial court determined that the State met its burden of proof on the following bases: (1) she had failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) she had failed to make reasonable efforts to correct the conditions that were the basis for removal of the minors during any nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(i)); (3) she had failed to make reasonable progress toward the return of the minors within the specific nine-month period from December 5, 2019, to September 5, 2020, following the adjudication of neglect (*id.* § 1(D)(m)(ii)); (4) she had failed to make reasonable progress toward the return of the minors within the specific nine-month period from September 5, 2020, to June 5, 2021, following the adjudication of neglect (*id.*); (5) she had failed to make reasonable

13

progress toward the return of the minors within the specific nine-month period from June 5, 2021, to March 5, 2022, following the adjudication of neglect (*id.*); and (6) she had failed to make reasonable progress toward the return of the minors within the specific nine-month period from September 7, 2021, to June 7, 2022 (*id.*).

¶ 34    Deandria argues that the trial court erred in finding that she was an unfit parent because she completed, and was successfully discharged from, all services required by DCFS, was employed on and off throughout the three-year duration of this case, and when transportation was available, she participated in the random drug tests. Her caseworker testified that her parenting visits with the twins went well and that the children gravitated to Deandria and clearly love her. On these bases, Deandria argues that the State failed to establish that she failed to show interest, concern, or responsibility regarding the welfare of Za. G. and Zy. G.

¶ 35    1. *Fitness—Failure to Maintain Reasonable Interest or Concern or Responsibility*

¶ 36    When the appellate court is required to examine a trial court's conclusion that a parent is unfit because she failed to maintain a reasonable degree of interest or concern or responsibility as to the welfare of her children (*id.* § 1(D)(b)), the focus is on the parent's reasonable efforts more so than the parent's success. *In re Konstantinos H.*, 387 Ill. App. 3d 192, 204 (2008). Because the legislature used disjunctive language in drafting this section of the Adoption Act, "any of these three elements may be considered on its own as a basis for unfitness: the failure to maintain a reasonable degree of interest *or* concern *or* responsibility as to the child's welfare." (Emphases in original.) *Id.* In analyzing the issue, the court must consider any circumstances that would have made it difficult for the parent to exhibit the required reasonable degree of interest and concern, including transportation issues. *Id.* "Noncompliance with an imposed service plan and infrequent

14

or irregular visitation with the child may be sufficient to warrant a finding of unfitness under section (b)." *Id.* (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)).

¶ 37     Here, Deandria was successful in completing all DCFS-mandated service tasks except for compliance with random drug tests. She completed less than 20% of those required and tested positive on many that she did complete. We believe that Deandria was committed to the program in principle but not committed to discontinuing her marijuana usage. The legalization of marijuana in Illinois adds an element of complication in cases where the parent continues to use marijuana since the drug is no longer an illegal substance for recreational use.

¶ 38     The foundation of this case was rooted in the fact that Deandria had not complied with her DCFS-imposed service plan involving four other children and, as a result, her parental rights to those four children were terminated in 2016. The more current component of this case was the fact that she used marijuana during her pregnancy and the twins, Za. G. and Zy. G., were born with marijuana in their systems. Thus, Deandria's marijuana consumption was front and center in this case. The legalization of marijuana is something that juvenile courts must consider in child protection cases. That said, marijuana and alcohol are still substances that can be abused, and legal or not, can factor into cases involving the welfare and safety of children. *In re A.T.*, 2021 IL App (2d) 200497-U, ¶ 75.[6]

¶ 39     The legislature has determined that an "addiction to drugs" can support a finding of parental unfitness. See 750 ILCS 50/1(D)(k) (West 2020). The legislature, concerned with the welfare of minor children, did not limit drug addiction to substances that are considered illegal. Thus, an addiction to alcohol or marijuana can form a basis of a court's finding that a parent is

---

[6]Citing as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023), which provides as follows: "a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes."

15

unfit. *Id.* Moreover, Deandria's chronic marijuana usage is not an insignificant factor in determining whether she is a fit parent because marijuana was at the core of the reason the children were originally removed from her care. See *In re K.I.*, 2016 IL App (3d) 160010, ¶ 43 (finding that the mother's marijuana usage, and sporadic compliance with random drug testing, were central issues in the removal of her child).

¶ 40     We note that the mere usage of alcohol and/or marijuana does not provide a basis for the trial court to find a parent unfit. See *In re L.M.*, 2021 IL App (4th) 210145-U, ¶ 38 (although the father acknowledged weekly marijuana use, that admission did not establish that he was addicted to marijuana).[7] Given the specific facts of each case, the trial court must determine if the parent's abuse of alcohol and/or marijuana amounts to an addiction that could result in potential harm to the child. See 750 ILCS 50/1(D)(k) (West 2020). We find the appellate court's reasoning in *In re Z.R.*, 2022 IL App (2d) 210758-U,[8] persuasive. In *In re Z.R.*, the father acknowledged his twice-daily use of marijuana but took issue that his regular marijuana consumption had any bearing or posed a risk of harm to his children. *Id.* The appellate court disagreed with the father's argument that service directives regarding his marijuana usage were unnecessary and stated: "Notwithstanding the legality of the use of marijuana in Illinois, when a neglect petition is based upon a child having been born exposed to marijuana, the parents' use of marijuana in the home is relevant to the matter of their fitness." *Id.* ¶ 52.

¶ 41     Here, Deandria was made abundantly aware that her use of marijuana was preventing her from regaining custody of the twins. At the fitness hearing, Deandria raised transportation as the

---

[7]Citing as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023), which provides as follows: "a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes."

[8]Citing as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023), which provides as follows: "a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes."

16

reason for her drug testing noncompliance. However, the State amply established that there were months during this case when Deandria had her own vehicle and was unemployed and therefore had no plausible excuse that she would miss work to present for the required drug tests. Similarly, when Deandria did not have a vehicle, she testified at the fitness hearing that she knew how to take a bus. Caseworker Lucas testified that while she was assigned to the case, Deandria never requested assistance with transportation. Significantly, when asked why she did not report for these drug tests that were scheduled at times when she was not employed and had access to, or knew how to obtain, transportation, Deandria replied: "Just out doing what I wanted to do at that time."

¶ 42    Based upon DCFS reports and testimony, we believe that Deandria loves her children and thus has a level of concern for their welfare. Ultimately, her defiance of the system and decision to continue her regular marijuana usage, despite being amply informed about the consequences of her choices, established that she did not have the requisite level of responsibility. Deandria demonstrated a clear disregard for the court's orders and failed to correct the conditions that caused the removal of the children. By not complying with the testing protocol component of her service plan, DCFS had no ability to determine the level of risk Deandria posed to Za. G. and Zy. G. Accordingly, we find that the trial court's order concluding that Deandria was unfit on the basis that she failed to maintain a reasonable degree of interest, concern, or responsibility was not contrary to the manifest weight of the evidence.

¶ 43    2. *Fitness—Failure to Make Reasonable Efforts During Any Nine-Month Period*

¶ 44    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort that is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d)

17

180218, ¶ 24. "A parent's deficiencies collateral to the conditions that were the basis for the removal of the children are not relevant to the reasonable efforts analysis." *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002).

¶ 45    Deandria's efforts to correct the marijuana concerns that brought the twins into this DCFS case immediately after birth were negligible. She opted not to consistently comply with the mandated random drug tests. However, we find that compliance with the random drug tests was not the sole factor in this case. As stated earlier, when Deandria submitted to drug tests and the tests were positive for marijuana, her marijuana levels were quantitatively high. According to the DCFS reports in this case, minor usage of marijuana—if measured below the cutoff levels—would not be considered a positive test result. Concern with Deandria's use was not simply her failure to comply or possible refusal to comply with testing. Rather, DCFS's primary concern was with the consistently high marijuana levels quantitatively measured and what that could mean for the safety of the twins in Deandria's care given those high levels. With the testimony of Deandria's caseworker about how she consistently reminded Deandria to comply with testing, we cannot find that Deandria's efforts were reasonable toward correcting the marijuana-based conditions that brought the twins into DCFS care. We find that the trial court's order finding that Deandria failed to show reasonable efforts toward correcting these conditions is not contrary to the manifest weight of the evidence.

¶ 46    3. *Fitness—Failure to Make Reasonable Progress During Any Nine-Month Period*

¶ 47    "Reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *Daphnie E.*, 368 Ill. App. 3d at 1067).

18

"The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *Id.* (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001)).

A parent makes reasonable progress when the trial court can find that the progress "is sufficiently demonstrable and of such a quality" that the trial court may soon be able to order the return of the minor to the parent's custody. *Id.* (citing *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22).

¶ 48    In this case, we know that Deandria corrected the additional conditions required after her integrated assessment. She successfully completed her substance abuse treatment,[9] mental health treatment, and parenting classes and completed a housing program. In addition, as of the date of the fitness hearing, Deandria was employed. We also know that Deandria inadequately complied with the DCFS requirement that she submit to regular random drug tests. The tests that she completed raised additional drug-related concerns because of the amount of marijuana that she was using. She also twice tested positive for opiates. Deandria claims that she tested positive for opiates because a physician prescribed narcotics for her after she underwent a tubal ligation surgery in November 2021. Caseworker Lucas specifically asked Deandria if a provider had prescribed pain pills for her. Deandria admits that she did not tell Lucas about the prescription. DCFS was never provided proof of a narcotic prescription. Additionally, while it is possible that Deandria received a narcotic prescription for surgical pain, she did not verify the day of her surgery, other

---

[9]We do not know what type of substance abuse treatment objectives were set by the provider. Upon Deandria's discharge, the caseworker expressed concern to the service provider that Deandria was not being truthful in her statements to the substance abuse provider that she was abstinent. Despite the caseworker's efforts and evidence of positive drug test results that contradicted Deandria's abstinence claims, the service provider satisfactorily discharged her from its program.

19

than to say that it occurred in November 2021. While she tested positive for opiates on November 5, 2021, which theoretically could match up to the claimed prescription, she also tested positive for opiates on December 9, 2020, 11 months before she was allegedly prescribed narcotics.

¶ 49    Missed random drug tests, without a verified excuse, are inherently problematic for the parent required to test. It is not known whether Deandria purposefully skipped the drug tests because she knew she would test positive. At the very least, missing a multitude of drug testing opportunities reflects Deandria's lack of commitment to the process. We do not believe that Deandria was any closer to having the children returned to her care because of the sustained marijuana usage. See *In re C.N.*, 196 Ill. 2d at 216-17. "[A]n unwillingness to cease using drugs represents a lack of responsibility." *In re M.I.*, 2016 IL 120232, ¶ 38. The parent in *In re M.I.* had expressed his unwillingness to stop using marijuana, which was then an illegal drug in Illinois. *Id.* Deandria's unwillingness to cease abusing marijuana, although now legal in Illinois, establishes her lack of responsibility. We conclude that the trial court's order finding that Deandria failed to show reasonable progress toward correcting these conditions is not contrary to the manifest weight of the evidence.

¶ 50    Considering the record on appeal as a whole, we find no basis to conclude that the trial court's determination that Deandria was an unfit parent was in error. We conclude that the trial court's finding that Deandria was an unfit parent was not contrary to the manifest weight of the evidence. See *In re A.W.*, 231 Ill. 2d at 104.

¶ 51                                    B. Best Interest

¶ 52    Having determined that the trial court correctly found that Deandria was an unfit parent, we turn to the best interest of Za. G. and Zy. G. Termination of a parent's rights is an extreme act. See *In re Adoption of Syck*, 138 Ill. 2d 255, 274-75 (1990). A parent maintains a superior right to

raise his or her own children. *In re Tiffany M.*, 353 Ill. App. 3d 883, 890 (2004). Once a parent has been determined to be unfit, "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. Until the court determines that a parent is unfit, the interests of both the parent and the child are concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship.' " *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760 (1982)).

¶ 53    After finding that a parent is unfit, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d at 366. On appeal of a best-interest determination, we must decide whether the trial court's decision is contrary to the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 54    "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must consider several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2020). The trial court may also consider the likelihood of adoption. *In re Tashika F*., 333 Ill. App. 3d at 170.

21

¶ 55 During the best interest hearing, the trial court stated that it had considered the relevant statutory best interest factors. See 705 ILCS 405/1-3(4.05) (West 2020). The court found that the Za. G. and Zy. G. needed permanence, stability, love, a sense of attachment, and security and that all of these factors would best be met by termination of Deandria's parental rights. The court referenced the fact that, because of the familial adoptions and planned adoptions, Deandria would still be able to see her children. However, given the paramount need for permanence, termination was appropriate.

¶ 56 Here, the record clearly reflects that termination of Deandria's parental rights was the appropriate outcome for the twins. The adoptive placement is with Deandria's sister. The court considered the familial placement as being a positive outcome as the twins were already bonded, would be living with their maternal cousins, and would also remain close to their older four siblings who had already been adopted by their maternal grandmother. We conclude that the trial court's decision to terminate Deandria's parental rights was not contrary to the manifest weight of the evidence. See *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 57                                III. CONCLUSION

¶ 58 For the foregoing reasons, we affirm the judgments of the circuit court of Macon County.

¶ 59 Affirmed.

*In re Za. G.*, 2023 IL App (5th) 220793

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Macon County, Nos. 19-JA-330, 19-JA-331; the Hon. Phoebe S. Bowers, Judge, presiding. |
| **Attorneys for Appellant:** | Monica Hawkins, of Hawkins, Amero & Root P.C., of Decatur, for appellant. |
| **Attorneys for Appellee:** | Scott Rueter, State's Attorney, of Decatur (Patrick Delfino, Patrick D. Daly, and Becky A. Ray, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |