NOTICE
Decision filed 06/07/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240133-U

NO. 5-24-0133

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* K.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-JA-14 |
| | ) | |
| Asia M., | ) | Honorable |
| | ) | Matthew D. Lee, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Moore and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: Evidence amply supported the circuit court's findings that respondent was unfit and that the minor's best interests required terminating her parental rights. As any contrary argument would be frivolous, we allow appointed counsel to withdraw and affirm the circuit court's judgment.

¶ 2    Respondent, Asia M., appeals the circuit court's orders finding her unfit to parent her son, K.M., and terminating her parental rights. Her appointed appellate counsel has concluded that there is no reasonably meritorious argument that the court erred in either respect. Accordingly, he has filed a motion for leave to withdraw as counsel on appeal together with a supporting memorandum explaining why he believes the issues to be frivolous. See *Anders v. California*, 386 U.S. 738 (1967). Counsel has notified respondent of the motion. This court has provided her ample

1

opportunity to respond, but she has not done so. After considering the record on appeal and counsel's motion and memorandum, we agree that this appeal presents no issue of even arguable merit. Thus, we grant counsel leave to withdraw and affirm the circuit court's orders.

¶ 3                                      BACKGROUND

¶ 4       Two days after K.M.'s birth, the Department of Children and Family Services (DCFS) took him into protective custody and the State filed a petition for adjudication of wardship. DCFS had learned that respondent was smoking while pregnant, she had not attended doctors' appointments that were necessary given her high-risk pregnancy, she did not have a stable home, and she had not dealt with her numerous mental health issues.

¶ 5       At a shelter care hearing on February 9, 2021, the circuit court placed K.M. temporarily in DCFS's custody. The court found that K.M.'s father, Javon J., was in jail and respondent had several significant mental health diagnoses, had received inpatient treatment for nine months, was herself a 15-year-old ward of the court, had smoked marijuana during her pregnancy, had had 12 custodial placements during the pregnancy, and had no stable residence for herself and K.M.

¶ 6       At a subsequent hearing, respondent stipulated to the petition's allegations, and Javon J. waived a hearing. The court found a sufficient factual basis for the stipulation. Accordingly, the court found K.M. to be neglected because of an injurious environment.

¶ 7       At a dispositional hearing on June 15, 2021, the court found both parents to be unfit and unable to parent, adjudged K.M. to be neglected, made him a ward of the court, and vested custody and guardianship of him in DCFS. Between October 2021 and September 2023, the court reviewed the case seven times.

¶ 8       The State moved to find both parents unfit and to terminate their parental rights, alleging that they had failed to make reasonable efforts to correct the conditions that led to K.M.'s removal

2

during the nine-month period from December 15, 2022, through September 15, 2023 (count 1); failed to make reasonable progress toward his return during the same period (count 2); and failed to maintain a reasonable degree of interest, concern, or responsibility for his welfare (count 3).

¶ 9    At the adjudicatory hearing, the family's caseworker, Ana Gragg, testified that when she took over the case, respondent had already been referred for substance abuse and mental health assessments and any recommended counseling, a psychological evaluation, drug screens, anger management classes, and parenting classes.

¶ 10    Respondent was willing to cooperate with parenting and anger management classes and, to a certain extent, drug screens. She stated, however, that she was going to continue to smoke marijuana, so drug screens were pointless. She would not cooperate with mental health or substance abuse services.

¶ 11    From December 2022 until February 2023, respondent had stable housing at the Young Lives group home in Champaign, which is a youth parenting home for parents who "needed a little more assistance." While respondent resided at Young Lives, Gragg observed some visits. She noted that respondent often did not pay close enough attention to K.M., resulting in potentially hazardous situations. Gragg would address these with respondent, but she was unwilling to accept the advice, complaining of being over-supervised.

¶ 12    Respondent left the Young Lives home, complaining that other people were eating K.M.'s food. Gragg then lost touch with her until respondent told her, in April, that she had moved to Chicago. She would not provide a specific address, however. She said that she moved because there were more things to do there. She also feared for her life because people in Champaign were threatening her.

3

¶ 13    Gragg eventually located respondent and made new referrals in Chicago for substance abuse and mental health assessments, a psychological evaluation, and drug screens. Gragg said that the providers were within walking distance or a short bus ride from respondent's address. However, she refused to engage with them unless she could visit with K.M. in Chicago. But visitation was not allowed in Chicago due to K.M.'s medical issues. The agency offered to pay for train or bus fare between Champaign and Chicago, but respondent declined, saying she did not know how to use the bus system and did not want to ride the train. She did, though, have visits when she periodically visited Champaign.

¶ 14    In June, Gragg received a report from the Chicago DCFS office that respondent had been arrested and charged with battery of a police officer, which suggested to Gragg that anger management services had been ineffective. Respondent returned to Champaign later that month, but she would not tell Gragg where she lived. Gragg sometimes "popped in on" respondent's visits with K.M. at the public library and asked her where she was living, but she would not say. Moreover, when discussing her address, respondent's attitude was "very aggressive, defiant" and insulting or threatening. Gragg again referred respondent for services in the Champaign area.

¶ 15    During this time, visitation was scheduled once a week, for four hours. Between February and June 2023, respondent visited K.M. five times. She ended one visit early because she thought she was being over-supervised. A visit scheduled for February 10 was to have been a birthday party for K.M., but respondent did not follow the protocol for getting background checks for the invitees, so it was canceled. Respondent was angry about the visit being canceled, saying that K.M. was her child and that "she was going to beat [Gragg's] behind."

¶ 16    From February 10 to March 31, respondent was offered eight visits but attended only two of them. After returning from Chicago in June, she was "somewhat consistent" in attending visits.

4

Between June 14 and September 15, she missed two. Respondent brought K.M. some clothes and toys.

¶ 17    In July 2023, respondent was involved in an altercation with her mother. According to a police report, respondent said that she and her mother had argued over respondent's desire to go to a liquor store for a cigar. Respondent became so angry that she broke the television, a lamp, and a candle. She grabbed a knife and threatened to slash her mother's tires. The car was found with a broken windshield.

¶ 18    In September, respondent moved into the ONYX Apartments. Because each bedroom is leased separately, she had no control over her roommates. Gragg performed a safety check in October and found numerous issues. When she attempted to make a return visit, respondent said she did not feel safe with her in her home.

¶ 19    Even though respondent completed anger management and parenting classes in August 2022, Gragg said she had never been close to returning K.M. to her care because her service providers did not think that the services were effective. Respondent would not accept constructive criticism from parenting class and was unaware of all of K.M.'s health issues and needs.

¶ 20    Gragg usually communicated with respondent via text. She could fairly easily contact respondent this way, but the latter often told her to stop texting and leave her alone. Gragg knew that respondent had been diagnosed with "[d]epression, trauma, [and] anxiety." She told Gragg that she had prescription mental health medicine that she did not take.

¶ 21    Respondent "did not fulfill" the agency's expectations during visits. She was more interested in what was on her phone. She and K.M. spent more time watching TV than interacting. Respondent also sometimes had issues providing food and putting K.M. down for a nap.

¶ 22    Respondent never completed a substance abuse assessment and completed a mental health assessment only in September 2023. At a family and child team meeting in March, she mentioned an altercation she was involved in, saying that she was defending herself and would do it again if necessary. This concerned Gragg because respondent had completed anger management classes and claimed they had been effective. Respondent also claimed to not understand why she had to do drug screens if she was smoking marijuana. She was not cooperative or willing to work with Gragg at the meeting and asked that she be removed as her caseworker. At a child and family team meeting on June 16, Gragg went over the list of services with respondent, who she said she would engage in them, but never did. At that meeting, respondent again threatened her.

¶ 23    Kristin Washington testified she was a case manager and parenting worker at Cunningham Children's Home. She worked with respondent periodically between 2020 and 2023. During this time, Washington observed visits, took respondent to appointments, talked with her about independent living skills, such as housing and jobs, and generally supported her. Washington stopped working with respondent in February 2023. She saw her at a hearing that month, and thereafter, it was hard to contact her for a couple of weeks. When asked she if she wanted to continue in the program, respondent said she did not care either way, so the program's directors "closed her out."

¶ 24    Kaytlan Brown, a case aide, observed two visits between respondent and K.M. Respondent ended both visits early because she felt Brown was following her around and supervising too closely. Respondent swore in front of K.M., causing him to look "very confused, concerned, scared [about] why we were leaving in such a hurry and what was happening."

¶ 25    During both visits, respondent spent time on her phone, talking to friends and relatives and being on social media. She would put K.M. in front of toys or the TV to keep him occupied and

would provide very little food for him. Arriving at the library for the March visit, K.M. had been reluctant to go inside, and Ms. Brown had to carry him. Respondent missed four scheduled visits for various reasons. In total, respondent was scheduled for six or seven visits and missed four of them.

¶ 26    Amanda Fernandez, an Evanston police officer, said that she was dispatched to a Pizza Hut, where an offender had battered an employee. During her investigation, she encountered respondent, who aggressively resisted questioning by police and resisted arrest, kicking both Fernandez and another officer.

¶ 27    Respondent testified that Gragg had been her caseworker since sometime in 2022. She had been referred to parenting and anger management classes and for mental health and substance abuse assessments. She had been in parenting classes since sometime in 2022. She took a substance abuse assessment, which recommended no further treatment. However, she acknowledged smoking marijuana every day. She got a mental health assessment in October 2023. Treatment was recommended and she was receiving counseling.

¶ 28    Respondent said she regularly visited with K.M. She moved to Chicago in late February 2023, and returned in mid-June. She acknowledged that she left Champaign, where her caseworkers, support, and child were, and that she had no car. However, Chicago was the only place that had an approved placement that wanted her. While in Chicago, she told the caseworker where she lived. She had no visits in Chicago, having been told "until I do services then I cannot have visitation." As to whether she was trying to do services, she said, "I was sent plenty of services, but I didn't have no transportation in Chicago and they were 30 minutes away from my home, so ***." Her caseworker offered a train ticket but no transportation to get to the train or to any other services. She was 40 minutes from the train station and had no money to get there.

7

¶ 29    As soon as she got back to Champaign, she contacted Gragg and visits resumed. Visits were scheduled every Friday for four hours. As to whether she attended all the visits, she said, "Yes. I attend the majority of them." They went well, and K.M. was happy around her.

¶ 30    Respondent had been living at ONYX Apartments for the past five months. K.M. was two years old. She attended a few of his medical appointments. She knew that K.M. was placed with Desme Davis, but she had not maintained contact with the foster mother. However, she had "provided things to the foster parent for" K.M.: "[c]lothes, shoes, toys, anything." At visits, she did not provide diapers but provided food and, most of the time, toys, explaining that "[a]nything he wanted I just got it."

¶ 31    Respondent said that she had grown as a person and as a parent during the life of this case. As a parent, she said, "I did have my baby at 14. I didn't know anything about parenting. *** I interact with him more than what I used to. I feel like my attention majority of the time is on him. I'm very concerned about his care, his safety, period. I mean, I'm not the best, but I'm good at what I do." She thought she was putting in a lot of work on parenting but was not being appreciated for it, and she found counseling and parenting and anger management beneficial. She turned 18 shortly before the adjudicatory hearing. Respondent was working to secure an additional room at ONYX for K.M.

¶ 32    The court found that respondent had failed to make reasonable progress toward the return of the minor. However, the court found that the State had not proved the additional counts alleging lack of reasonable efforts and lack of interest, concern, and responsibility.

¶ 33    At the best-interests hearing, the court noticed a report stating that K.M. had been placed with a foster parent since he was two days old. The report described K.M. as "a very energetic and rough boy that is full of laughter." He was "very advanced," knew how to count, knew his ABCs,

8

and was nearly potty-trained. He was very attached to his foster mother, whom he called "mommy" and to whom he looked for comfort. Likewise, he was bonded to her other children and to her granddaughter. The foster mother provided for all of his needs. She also noted his tendency toward anger and aggressiveness and was addressing those tendencies effectively. Respondent had been offered 40 visits during the 9-month period but exercised only 18 of them, ending several of those early. The report recommended the termination of respondent's parental rights and a change of the permanency goal to adoption.

¶ 34    After considering the report, the court found that it was in K.M.'s best interest to terminate respondent's parental rights. Respondent timely appeals.

¶ 35                                ANALYSIS

¶ 36    Respondent's appointed appellate counsel concludes that the only issues he could conceivably raise are (1) whether the court's finding that respondent failed to make reasonable progress toward K.M.'s return home was against the manifest weight of the evidence and (2) whether the court abused its discretion in terminating respondent's parental rights. Counsel concludes that neither issue has even arguable merit and we agree.

¶ 37    On appeal from findings that a parent is unfit and that terminating her parental rights is in the child's best interests, we must not retry the case but, instead, review the circuit court's findings to decide if they are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. A finding of unfitness is given great deference because the court had the best opportunity to view and evaluate the parties and their testimony. *Id.*

¶ 38    Here, the court found respondent unfit on the ground that she failed to make reasonable progress toward the return of K.M. within a specific nine-month period. See 750 ILCS 50/1(D)(m) (West 2020). "Reasonable progress" is judged by an objective standard, based upon the amount of

9

progress measured from the conditions existing at the time custody was taken from the parent. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47.

¶ 39 " 'The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent.' " *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

¶ 40 Counsel notes that respondent was 14 years old when she gave birth to K.M., was herself the court's ward in a separate case, and had longstanding mental health issues, but concedes that reasonable progress is an objective standard and that respondent's progress was not objectively reasonable. *In re Jordan V.*, 347 Ill. App. 3d 1057, 1068 (2004). By that objective standard, the court's finding that respondent failed to make reasonable progress was amply supported by the evidence.

¶ 41 Testimony at the hearing showed that respondent unapologetically continued to use marijuana almost daily. See *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 49 (unwillingness to cease abusing marijuana, although now legal in Illinois, shows lack of responsibility). Moreover, she only sporadically cooperated with services. She was frequently hostile toward caseworkers, resenting their perceived interference, and threatened Gragg multiple times. She moved to Chicago, away from K.M., her caseworkers and service providers. Although Gragg referred her to services in Chicago, she did not engage. Despite completing anger-management counseling, she continued to be involved in altercations, striking multiple police officers, and threatening her mother. She frequently missed visits with K.M. or ended them early. During the visits, she often did not actively engage with K.M., but spent time on her phone or watching television. This

10

evidence supported the court's finding that respondent objectively failed to make reasonable progress.

¶ 42 We note that respondent's testimony contradicted some of this evidence. However, the court was well within its prerogative to credit the caseworkers' testimony over that of respondent. See *id.* ¶ 31 (circuit court's finding of unfitness is given great deference because court had the best opportunity to view and evaluate the parties and their testimony).

¶ 43 Counsel further concludes that there is no good-faith argument that the court erred by terminating respondent's parental rights and making K.M. available for adoption. Once a parent has been determined to be unfit, "the parent's rights must yield to the child's best interest." (Internal quotation marks omitted.) *Id.* ¶ 52. After finding that a parent is unfit, the State must prove by a preponderance of the evidence that termination of a parent's rights is in the child's best interest. *Id.* ¶ 53 (citing 705 ILCS 405/2-29(2) (West 2020)). On appeal of a best-interest determination, we must decide whether the court's decision is contrary to the manifest weight of the evidence. *Id.* " '[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life.' " *Id.* ¶ 54 (quoting *In re D.T.*, 212 Ill. 2d 347, 364 (2004)).

¶ 44 Here, the report showed that K.M. has lived his entire life in the care of his foster family, with whom he has bonded and who provide him with love, stability, and security. His foster mother is willing to provide permanency to him, via adoption.

¶ 45 CONCLUSION

¶ 46 As this appeal presents no issue of arguable merit, we grant counsel leave to withdraw and affirm the circuit court's judgment.

¶ 47     Motion granted; judgment affirmed.