NOTICE
Decision filed 09/18/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230284-U

NOS. 5-23-0284, 5-23-0285 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* E.L. and P.L., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 13-JA-127, 13-JA-128 |
| | ) | |
| Elsie L.G., | ) | Honorable |
| | ) | William G. Clay IV, |
| Respondent-Appellant.) | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Boie and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the trial court's orders finding that Elsie L.G. was an unfit parent, and that the best interest of the minors required termination of her parental rights, were not contrary to the manifest weight of the evidence, we affirm.

¶ 2    Elsie L.G. (Elsie) is the mother of E.L., a female child, and P.L., a male child. The Department of Children and Family Services (DCFS) opened an intact family case in July 2012. In November 2013, DCFS removed both children from the home following a hotline report that the children were being inadequately supervised. The children were placed in a foster home at that time. The State initially filed petitions to terminate Elsie's parental rights in December 2017. The State dismissed its petitions in October 2018 and reinstated the petitions in June 2019. The trial court found that Elsie was an unfit person in November 2021 and in December 2022 terminated

1

her parental rights. Elsie does not raise any issues on appeal regarding the best interest hearing that resulted in the termination of her parental rights. She only appeals from the orders finding that she was an unfit person.

¶ 3                                    I. BACKGROUND

¶ 4     E.L. was born on October 17, 2012, and P.L. was born on August 25, 2011. Their mother is Elsie, and their father is Marcus J., who is not involved in this appeal.

¶ 5     DCFS became involved in this case in mid-2012 before E.L.'s birth. At the time of the 2012 report, Elsie was homeless and living in a shelter. Other residents reported that Elsie left P.L. unsupervised. P.L. reportedly crawled out of the room and was found with an electrical cord in his mouth. There were other reports that Elsie frequently screamed at P.L. DCFS stated that it had concerns about Elsie providing inadequate supervision, and also having unrealistic expectations of her baby's development and needs. DCFS's report "indicated" Elsie for inadequate supervision of P.L.

¶ 6     DCFS opened an intact family case and implemented a safety plan for Elsie to address the issues that were threatening P.L.'s safety. DCFS determined that Elsie needed assistance with housing, employment, mental health, parenting, and assistance with community resources.

¶ 7     On August 26, 2013, DCFS received a hotline call about Elsie's treatment of P.L. Elsie was captured on surveillance video at her group home picking P.L. up by his hair and then dropping him on the floor. In addition, the hotline caller stated that Elsie kicked P.L. On August 27, 2013, DCFS removed E.L. and P.L. from Elsie's care and placed the children in a foster home. Thereafter, Elsie was arrested for domestic battery. On August 29, 2013, the trial court held a temporary custody hearing, and ruled that the case involved neglect and not abuse. The court returned the children to Elsie and directed DCFS to maintain the intact family case.

2

¶ 8      On November 23, 2013, DCFS received another hotline call regarding the children. The caller reported that Elsie and the children were living at the home of one of Elsie's friends. According to the report, Elsie was sleeping all day and did not feed or bathe her children. The children frequently cried and were unable to wake Elsie. The friend told DCFS that they were no longer willing to allow Elsie and the children to continue living with them. DCFS reported that Elsie was not cooperating with the intact family services being provided to her by its agent, Children's Home & Aid. On November 27, 2013, DCFS again removed the children from Elsie's care and placed them in a foster home. That same date, the trial court entered its temporary custody order, noting that Elsie had been noncompliant with services involving "domestic violence, anger management, and parenting classes."

¶ 9      The shelter care and adjudicatory hearings were initially set for December 16, 2013, but were continued multiple times until July 7, 2014. E.L. and P.L. were adjudicated as neglected minors and found to have been living in an environment that was injurious to their welfare. More specifically, the court found that the mother and children had been missing for weeks and the assigned worker was unable to observe and assess the safety and well-being of the children. The order does not provide details about when Elsie and the children were "missing." In addition to adjudicating the children as neglected, the trial court entered its dispositional findings that it was in the children's health, welfare, and safety as well as in the minors' best interest to make them wards of the court. The court found that Elsie was unable to care for the children for reasons other than financial circumstances alone. The court set the permanency goal to return the children home within 12 months. The record on appeal does not contain the transcript of the hearing.

¶ 10     The record on appeal lacks detail about Elsie's service plans and the children until an advocate with CASA of Southwestern Illinois filed his report with the trial court in March 2015.

3

The advocate reported that the children had been placed in a second foster home in Shiloh. This placement occurred in April 2014. Elsie was living with a cousin in Collinsville, as well as living at her pastor's O'Fallon residence. The advocate also reported that he had observed some of Elsie's visits with the children and commented that Elsie lacked necessary parenting skills. DCFS secured the services of a parenting coach to work with Elsie.

¶ 11 The first service plan for Elsie and the children included in the record on appeal was dated November 13, 2017. DCFS reported that Elsie had not engaged with individual counseling since 2015, had not completed domestic violence services, had not completed specialized training designed to provide her with a better understanding of the needs of her children, and still lacked stable housing. Overall, Elsie had not engaged in any services within the past six months. Elsie was taking advantage of her supervised visits with the children, but DCFS noted that her attendance was sporadic. Elsie also had not attended her monthly scheduled appointments with her caseworker.

¶ 12 In September 2017, the CASA advocate provided an update about the children. P.L. had begun kindergarten in Shiloh in 2016 but was having significant behavioral problems in school that resulted in his being transferred to the Pathways School in Belleville.[1] At the beginning of the 2017 school year, P.L. started in the Shiloh school, but was again transferred to Pathways School because of his behavioral issues. The advocate reported that P.L. had been hospitalized for several days to address these behaviors. E.L. was in pre-kindergarten and doing well. The advocate stated that in his observations, Elsie was still not capable of parenting the children.

---

[1]Pathways is a school for children who have not been successful in a public-school setting and have substantial social, emotional, and behavior disorders. https://www.bassc-sped.org/o/bassc/page/bassc-pathways-program

¶ 13 On December 15, 2017, the State filed its motion seeking to terminate Elsie's parental rights. The State alleged that Elsie had failed to make reasonable progress toward the return of her children during any nine-month period following the adjudication of neglect and that she had failed to make reasonable efforts to correct the conditions that were the basis for removal of the children during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D) (West 2016).[2]

¶ 14 The trial court scheduled the fitness hearing for April 9, 2018. Elsie did not appear at that hearing, and the trial court entered a default order finding that she was an unfit person. However, on April 10, 2018, the State appeared in court and obtained a court order setting aside the default judgment against Elsie.

¶ 15 The next service plan in the record on appeal is dated May 18, 2018. DCFS reported that Elsie had not engaged in any services within the preceding six months. She attended supervised visits with the children. Elsie did not yet have stable housing but was employed by temporary agencies. She had been diagnosed with post-traumatic stress disorder, histrionic personality disorder, antisocial personality disorder, narcissistic disorder, and attention-deficit hyperactivity disorder (ADHD). DCFS noted that the hearing on the State's petition to terminate parental rights had been continued five times but was then scheduled for hearing in July 2018. Elsie was rated unsatisfactory on weekly mental health counseling. Elsie had not attended a counseling session since September 2015, but she had been referred to Chestnut Health Systems. She was rated unsatisfactory on improvement of parenting skills. Elsie had completed an initial parenting course,

---

[2]The State also included a third ground for termination of Elsie's parental rights: that she was unable to discharge her parental responsibilities as supported by competent evidence of mental impairment. 405 ILCS 5/1-116 (West 2016). As there was no evidence adduced to support this ground throughout the extended duration of this case, we believe that this ground for termination may have been mistakenly included in the State's motion.

but DCFS determined she would benefit from parenting coaching during child visits. However, Elsie refused this service. Elsie was rated unsatisfactory on attending specialized foster care training to address the needs and behaviors of her children. She was rated unsatisfactory on addressing her history of domestic violence in relationships to avoid similar relationships in the future. DCFS referred her to Chestnut Health Systems for domestic violence services. Elsie was rated unsatisfactory in individual counseling at Chestnut Health Systems for her history of being sexually abused. Elsie completed the assessment on June 19, 2013, which recommended counseling, but she did not engage in counseling. Due to the passage of time, DCFS indicated that she would now need to complete a new sexual abuse assessment. Elsie successfully completed a substance abuse assessment and all related services approximately four years before the date of this service plan.

¶ 16    On October 25, 2018, the trial court entered an order that stated: "On State's motion, and by agreement of all parties, the State's Motion for Termination of Parental Rights and for Appointment of Guardian with Power to Consent to Adoption is hereby dismissed with leave to reinstate." The record on appeal does not contain a written motion to dismiss, and the record does not contain a transcript of the hearing held that date. The reason for the State's dismissal is not contained in the record or in the briefs on appeal.

¶ 17    DCFS's next service plan was dated October 30, 2018. Elsie engaged in no services the preceding six months. She did not meet with her caseworker. Elsie recently moved into a friend's trailer that was not deemed environmentally appropriate for the family. In all other matters, there had been no change in Elsie's required services, and she was rated unsatisfactory on all current services.

¶ 18     The CASA advocate filed his next report in April 2019. He reported that P.L. continued to struggle at the Pathways School, throwing tantrums and having "meltdowns." His school counselor reported that he did not bond well, was sometimes "depressed," and had threatened self-harm. The counselor was working with P.L.'s foster mother, and P.L. was scheduled to begin mental health services through Chestnut Health Systems. The advocate reported that the foster mother's social work background was helpful in dealing with P.L.

¶ 19     DCFS through its agency, Children's Home & Aid,[3] filed its permanency report with the trial court in April 2019. Elsie completed a mental health assessment on September 26, 2017, but was unsuccessfully discharged from Chestnut Health Systems due to a lack of attendance and engagement. Elsie was living in a trailer in Caseyville that was not considered a "return home environment." She was unemployed. Elsie was consistent with visitation, but disregarded all recommendations to effectively engage with the children. The trial court entered its permanency order on April 15, 2019, and found that Elsie had made neither reasonable efforts nor reasonable and substantial progress toward returning the children home.

¶ 20     The next service plan prepared by DCFS was dated May 6, 2019. Elsie was rated unsatisfactory on all current services. DCFS filed its next permanency report on May 28, 2019, in which it rated Elsie unsatisfactory on all aspects of her service plan. The trial court entered its permanency order on June 3, 2019. The trial court made no findings relative to Elsie's progress and efforts.

---

[3]The permanency hearing reports, and other reports filed with the trial court, were sometimes printed on Children's Home & Aid letterhead. Children's Home & Aid was acting on behalf of DCFS in this case. Some of the permanency hearing reports were not printed on any letterhead, and thus, we do not know if the reports were filed by Children's Home & Aid or directly by DCFS. For continuity throughout this order, we will refer to the entity who filed these pleadings, reports, and/or documents, as DCFS.

¶ 21    On June 3, 2019, the trial court granted the State's motion to reinstate the petition to terminate parental rights. The State's motion to reinstate was not included in the record on appeal, and the hearing was not transcribed.

¶ 22    The CASA advocate filed his next report with the trial court on August 26, 2019. The advocate reported that P.L. behaviorally struggled throughout the summer in that he was barred from returning to his daycare facility, was kicked out of a YMCA summer program, and was sent home from the Shiloh school summer program several times. P.L.'s behavior had become increasingly aggressive. At the beginning of the school year at Pathways School, P.L. attacked another student in the transportation vehicle. Upon arrival at Pathways School, staff members were able to remove P.L. from the transportation vehicle. After exiting the vehicle, P.L. tried to physically harm staff members and caused property damage. Staff members were ultimately able to restrain P.L. Because of these behaviors, P.L. was admitted to Lincoln Prairie Behavioral Health Center, a residential psychiatric hospital for children in Springfield. The foster mother reported to the advocate that both children had asked to discontinue parent visits.

¶ 23    On October 7, 2019, DCFS filed its report of the guardian with the trial court. Because P.L. had been admitted to a psychiatric facility, DCFS held a priority clinical staffing to determine if the care was appropriate, and to determine what placement would be in P.L.'s best interest upon discharge. DCFS determined that upon discharge P.L. needed to be in a residential facility to receive "trauma-focused treatment to address [his] emotional, social and behavioral issues." DCFS also recommended that P.L. participate in rhythmic activities, such as swimming or skateboarding as those type of activities provide therapeutic benefits for traumatized children. As of the date of the report, P.L. was on waitlists for residential placements.

¶ 24    The October 4, 2019, permanency report filed by DCFS reflected no change in Elsie's progress, other than that she had obtained warehouse-based employment. The agency recommended that the permanency goal be changed to substitute care pending the determination of the State's reinstated petition to terminate parental rights. No permanency hearing was held in October, and the hearing was apparently continued[4] until December 2019.

¶ 25    DCFS filed its next family service plan on October 21, 2019. The service plan objectives for Elsie remained the same. There was no change in Elsie's compliance with any of the current services required.

¶ 26    On November 27, 2019, DCFS filed its permanency report. As of that date, P.L. remained in the Springfield psychiatric hospital. Elsie was rated unsatisfactory on all service plan objectives. While Elsie claimed that she was employed at an Edwardsville warehouse, she had provided no verification of income. The trial court entered its permanency order on December 2, 2019, finding that the appropriate permanency goal was substitute care pending determination of termination of parental rights. The court found that Elsie had not made reasonable efforts nor reasonable and substantial progress toward returning the children home.

¶ 27    DCFS's next family service plan was dated February 12, 2020. Elsie had yet to provide verification of employment. Elsie was rated unsatisfactory on all current service plan objectives.

¶ 28    DCFS filed another family service plan dated May 18, 2020. In this plan, DCFS reported that Elsie said she had completed a new mental health assessment at Chestnut Health Systems, and that no services were recommended. DCFS contacted Chestnut Health Services to obtain a copy

---

[4]Many hearings were scheduled in this case in its approximate eight-year history. Often times, there would be no "order" in the preprinted order forms, other than inclusion of a new court date. This October 2019 order is an example. The hearing scheduled for that date was a permanency hearing based upon information included in DCFS's permanency report filed in advance of the hearing. The record on appeal contains no motion to continue, and the "order" does not reference a continuance, but simply lists a different court date.

of this assessment but was informed that Chestnut Health Systems had no record that it had recently seen Elsie.[5] Elsie was rated unsatisfactory on all current service plan objectives.

¶ 29    On May 27, 2020, DCFS filed its permanency hearing report with the trial court. Elsie was rated unsatisfactory on her service plan objectives. DCFS reported that on November 21, 2020, P.L. was transferred to St. John Bosco Children's Center, a residential facility in Belleville. The trial court entered an order on June 1, 2020, apparently continuing the permanency hearing until July 2020.

¶ 30    On July 2, 2020, DCFS filed its next permanency hearing report with the trial court. Elsie had moved out of the Caseyville trailer and in with a friend. She reported that she had been approved to move into her own apartment in Granite City. Overall, Elsie was rated unsatisfactory on all current service plan objectives. The next permanency hearing was scheduled for July 7, 2020, and the fitness hearing was set for July 13, 2020, but the trial court continued the case. On July 13, 2020, the trial court entered a permanency order finding that Elsie had not made reasonable efforts nor reasonable and substantial progress toward returning the children home. The court indicated that because of the status of the case with the State seeking to terminate Elsie's parental rights, DCFS must discontinue all reunification services.

¶ 31    DCFS filed its family service plan on November 8, 2020. There were no changes relative to Elsie's progress on her service plan objectives. DCFS filed its permanency reports on December 29, 2020, January 19, 2021, and February 17, 2021. Elsie's apartment in Granite City was found to be satisfactory. She had established full time warehouse employment with Amazon, and her

_____

[5]During the fitness hearing, Elsie's attorney provided information confirming that Elsie did have a mental health assessment at Chestnut Health Systems in October 2019. In the forms she completed prior to the assessment, she acknowledged that she had experienced sexual abuse, emotional abuse, and physical abuse in the past. We presume that this assessment was to determine if Elsie needed mental health, domestic violence, and/or sexual abuse services. Chestnut Health Systems concluded that Elsie required no services.

employment service plan objective was rated satisfactory. On all other services, Elsie was rated unsatisfactory. The trial court held its permanency hearing on March 5, 2021, finding that Elsie had not made reasonable efforts nor reasonable and substantial progress toward returning the children home.

¶ 32    On April 26, 2021, the CASA advocate filed his next report, noting that P.L. remained in the residential group home. The advocate stated his belief that Elsie's parental rights should be terminated to provide permanency for the children as they had been in the foster care system for the past seven years.

¶ 33    On July 7, 2021, the State filed its notice designating the nine-month periods upon which it was relying in its petition to terminate Elsie's parental rights. The two nine-month periods were March 27, 2018, to December 27, 2018, and December 28, 2018, to September 28, 2019. The State indicated that Elsie had not made reasonable progress or reasonable efforts during these two nine-month periods.

¶ 34    The fitness hearing began on July 19, 2021. The State called two witnesses—Katherine Cotts, a program manager, and Christa Mizulski, a foster care supervisor. Both witnesses were employed by Children's Home & Aid. The fitness hearing concluded on September 27, 2021.

¶ 35    Katherine Cotts (Cotts) testified that she has been a program manager for the past 18 months, and prior to that she was a supervisor. Cotts was the supervisor on this case for a period of two years from July 2018 through May 2020. Cotts identified all service plans from 2017 to the date of the hearing. She testified about the specific service plans that were in effect during the two nine-month periods specified by the State in its addendum to the motion to terminate Elsie's parental rights. Elsie was required to obtain a new mental health assessment through Chestnut Health Systems, participate in individual counseling, participate in domestic violence services, and

11

complete a sexual abuse victimization reassessment through Chestnut Health Systems. In addition, Elsie needed to have appropriate housing, maintain employment, demonstrate appropriate parenting skills, and attend regular visitation with her children. From March 2018 through September 2019, Elsie did not participate in services for mental health, domestic violence, or sexual abuse services. In November 2018, Chestnut Health Systems discharged Elsie from service due to her lack of engagement, as she only had four face-to-face interactions.[6] She did not have a reassessment during that time frame. Elsie also continued to struggle with parenting and primarily used her cellular phone to interact with the children. Because of the children's behavioral problems, DCFS offered Elsie specialized parenting training to assist her in better interactions with her children. However, Elsie would not participate in the offered training and was therefore rated unsatisfactory on this required objective. During this period, Elsie missed about 5 of 18 monthly visits with her children because she failed to confirm the visits beforehand. Cotts testified that Elsie had self-reported an extensive history of domestic violence in her personal relationships. The assessment and counseling for domestic violence would have taken place at Chestnut Health Systems, but Elsie never had the assessment during the 18 months at issue. Housing also remained a difficulty for Elsie and she was never able to obtain housing that could have been considered as a return home environment for the children.

¶ 36    On cross-examination, Cotts confirmed that early on in this case, Elsie successfully completed her substance abuse service objectives and initial parenting classes. In addition, Elsie currently had appropriate housing and employment. Cotts confirmed that one of the resources offered to parents includes access to the county housing authorities. She testified that while those

---

[6]This testimony appears to establish that Elsie reengaged in counseling at Chestnut Health Systems for a limited number of sessions, potentially dating back to the September 26, 2017, mental health assessment referenced by DCFS in its April 2019 permanency report. The timing of these sessions is not included in the record on appeal.

were made available to Elsie, the county housing authorities had lengthy waiting lists. In addition, if Elsie had a current mental health diagnosis as determined by Chestnut Health Systems, she could have been approved for a different housing program. At that time, however, Chestnut Health Systems had not diagnosed Elsie with a mental health disorder. While other providers had diagnosed her with mental health disorders, the housing program was set up and connected to Chestnut Health Systems. Cotts confirmed that at the start of this case Elsie completed anger management classes and parenting classes, and that these completions were not reflected on her service plan. Cotts also confirmed that DCFS did not require or recommend that Elsie obtain a psychiatric consultation to determine if she needed psychiatric medications.

¶ 37    Cotts testified that Elsie's attorney subpoenaed the agency to obtain copies of all emails from Chestnut Health Systems about Elsie. A Chestnut Health Systems email dated October 4, 2019, confirmed that Elsie completed a mental health evaluation and "due to lack of medical necessity, further services are not required." The email further indicated that although Elsie had been diagnosed with post-traumatic stress disorder, as she had informed Chestnut Health Systems that she was not experiencing any mental illness symptoms and her functioning was not impaired, Chestnut Health Services did not recommend further services due to a lack of medical necessity.

¶ 38    The guardian *ad litem* asked Cotts if Elsie had completed mental health services and/or been evaluated for sexual abuse treatment. Cotts testified that Elsie had been discharged from Chestnut Health Systems for inconsistent attendance, and thus had not completed these services during the relevant nine-month periods. Cotts also testified that Elsie was recommended to engage in one-on-one parenting coaching, but she was unsuccessfully discharged for lack of attendance.

¶ 39    The State next called Christa Mizulski (Mizulski). Mizulski had been employed as a foster care supervisor and as a case manager for the previous three years. She testified that she was

13

familiar with Elsie and the children. During the time she was involved with the case, Elsie was consistent with her visitation with E.L., but less so with P.L., who was in the Springfield psychiatric hospital.

¶ 40   Mizulski testified that in 2019, DCFS asked Elsie to undergo another mental health assessment, and to address sexual abuse and domestic violence through Chestnut Health Systems. She confirmed that the paperwork from the October 2019 assessment reflected that Elsie informed the assessor that she had a history of being sexually abused, emotionally abused, and physically abused, and that after the assessment, Chestnut Health Systems did not recommend services for Elsie. She testified that Children's Home & Aid did not receive that email from Chestnut Health for many months. However, Mizulski testified that despite the lack of a recommendation from Chestnut Health Systems, based upon what they observed with their interactions with Elsie, it was believed that Elsie still needed additional mental health counseling.

¶ 41   The guardian *ad litem* asked Mizulski to explain why Elsie needed to address the domestic violence concerns. DCFS believed that counseling would be beneficial for Elsie so that she would make better partner choices in the future because of her extensive history of sexual and physical abuse in relationships.

¶ 42   At the conclusion of the fitness hearing, the trial court took the motion under advisement. On November 22, 2021, the trial court entered its order granting the State's motion and finding that Elsie was an unfit person in that she had failed to show reasonable efforts and/or reasonable progress toward returning the children home. The court based its decision upon the evidence and testimony that Elsie was rated unsatisfactory on her service plan objectives during the relevant time periods—March 2018 through September 2019. 750 ILCS 50/1(D)(m)(ii). The court found that the State had proved the allegations by clear and convincing evidence.

¶ 43    On December 8, 2022, the trial court held the best interest hearing. On December 16, 2022, the trial court entered its order finding that the State had proven by a preponderance of the evidence that it was in the best interest of the minors, E.L. and P.L., to terminate Elsie's parental rights. The trial court changed the permanency goal to adoption.

¶ 44    Elsie filed a posttrial motion on January 10, 2023, asking the trial court to set aside the termination order on the basis that there was additional psychiatric information about P.L. that would have been highly relevant on the issue of the foster parent's ability to adequately provide for P.L.'s needs. On March 30, 2023, the trial court denied the motion.

¶ 45    On April 19, 2023, Elsie filed her notice of appeal of the December 16, 2022, order terminating her parental rights. On appeal, Elsie is only contesting the fitness component of the order terminating her parental rights.

¶ 46                                    II. ANALYSIS

¶ 47    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)) provide the legal authority for the involuntary termination of parental rights in Illinois. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337 (2010)). Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The process mandated involves two hearings. In the first hearing, the State must prove by clear and convincing evidence that the parent is an "unfit person" as defined by the Adoption Act. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994)); 750 ILCS 50/1(D) (West 2020). If the trial court finds that the parent is unfit, the case proceeds to a second hearing where the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. *In re Za. G.*, 2023 IL App

15

(5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010)); 705 ILCS 405/2-29(2) (West 2020).

¶ 48    When a parent appeals the trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the appellate court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d 92, 104 (2008)). The reviewing court gives great deference to the trial court's finding of unfitness because the court had the best opportunity to view and evaluate the parties and their testimony. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Therefore, we do not reweigh the evidence or reassess the credibility of the witnesses on appeal. *Id.* (citing *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001)). "A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.* (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 49    We review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Elsie was an "unfit person." The trial court determined that the State met its burden of proof that Elsie failed to make reasonable progress toward the return of E.L. and P.L. within the two specific nine-month periods from March 27, 2018, to December 27, 2018, and from December 28, 2018, to September 28, 2019, following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 50                                  A. Fitness

¶ 51                    1. *Reasonable Efforts Within a Nine-Month Period*

¶ 52    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. The court

16

must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. "A parent's deficiencies collateral to the conditions that were the basis for the removal of the children are not relevant to the reasonable efforts analysis." *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002).

¶ 53    Elsie argues that the trial court's finding that she was unfit for failure to make reasonable efforts was contrary to the manifest weight of the evidence and focuses her argument on what she perceives were deficiencies in the services DCFS provided. Specifically, she notes that she had a psychological examination in 2015 that identified various possible diagnoses including ADHD. Elsie argues that the trial court erred in finding that she had not made reasonable efforts because DCFS did not "explore the issue" of her ADHD diagnosis. We disagree. This argument ignores the fact that DCFS included counseling in Elsie's service plans. If Elsie had engaged in the counseling, her counselor could have referred her to other Chestnut Health Systems providers with the licensure to prescribe medications. The claimed "failure" of DCFS in not exploring this diagnosis does not lie with DCFS, which included the requirement of individual counseling services in every service plan. Elsie was aware that she was required to have counseling for many reasons: her mental health, her history of sexual abuse, and her history of domestic violence. Elsie made her choice to forego the recommended counseling services.

¶ 54    Elsie's argument that DCFS failed in providing her with important services because it did not add a psychiatric evaluation to her service plan ignores the fact that Elsie did not engage in any services during the 18-month period. Elsie has no explanation or argument to counter the fact that her efforts during the 18 months at issue were virtually nonexistent. She was consistent with maintaining her visitation schedule, but refused any offers of parental coaching despite the DCFS

17

concerns that she could not effectively address the behavioral issues displayed by the children and had no effective way to interact with them other than with her cellular phone. The visitation supervisors repeatedly asked Elsie not to use her cellular phone during the visits. Moreover, during these 18 months, Elsie did not have acceptable housing. She may have been employed, but she was rated unsatisfactory on this objective because she never provided DCFS with verification of her employment and income. All other service plan objectives were rated as unsatisfactory as Elsie engaged in no services during the 18 months. Given the evidence and testimony of Elsie's case manager and supervisor, we find that Elsie's efforts were not reasonable toward correcting the conditions that brought E.L. and P.L into DCFS care. We find that the trial court's order finding that Elsie failed to show reasonable efforts toward correcting these conditions is not contrary to the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 55             2. *Reasonable Progress Within a Nine-Month Period*

¶ 56     The term "reasonable progress" requires an objective determination regarding the amount of progress based upon the conditions existing at the time the minor child's custody was removed from the parent. *Id.* ¶ 47 (citing *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

> " 'The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent.' " *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

18

"A parent makes reasonable progress when the trial court can find that the progress 'is sufficiently demonstrable and of such a quality' that the trial court may soon be able to order the return of the minor to the parent's custody." *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

¶ 57    The foundational issues in this case involved Elsie's lack of suitable housing, her inability to safely parent her children, and her unrealistic expectation of their needs and development. DCFS became involved via an intact family case in July 2012. Elsie was living in a shelter and P.L. was found wandering the shelter unsupervised. The August 2013 hotline call involved a report that Elsie had picked P.L. up by his hair and dropped him onto the floor. By November 2013, Elsie was living with a friend, but not attending to the needs of her children and expecting her friend to watch and care for the children. After this situation was reported to DCFS, E.L. and P.L. were taken into protective custody.

¶ 58    At the beginning of the case, Elsie successfully completed the substance abuse service plan tasks and completed the initial parenting course. Those completions occurred prior to the two nine-month periods at issue in this case. In determining whether a parent has made reasonable progress, courts must only consider evidence regarding the parent's progress during the relevant nine-month period or periods specified by the State. *In re J.L.*, 236 Ill. 2d at 341 (citing 750 ILCS 50/1(D)(m) (West 2008)).

¶ 59    During the 18 months at issue, Elsie engaged in none of the remainder of her service plan objectives. With input from her visitation supervisors, Elsie needed direct one-on-one parental coaching as well as specialized training designed to inform and assist her in addressing the behavioral problems her children exhibited. Elsie refused parental coaching and never engaged in the specialized training. Elsie was required to engage in individual counseling for her mental health through Chestnut Health Systems, and through that counseling, Elsie was to be evaluated and

19

counseled on matters related to her history of domestic violence and sexual abuse. Elsie had counseling with Chestnut Health Systems in 2015, and then four sessions on unspecified dates prior to March 2018, but she was unsuccessfully discharged from further services in November 2018. Elsie's housing was not appropriate for the children. Elsie reported that she had employment with temporary agencies but failed to provide documentation to DCFS. While Elsie was mostly consistent with visiting her children, she missed some visits for failing to confirm the sessions ahead of time.

¶ 60    Elsie argues that the trial court should not have found that she failed to make reasonable progress because DCFS did not "implement recommended services." In 2015, DCFS had Elsie undergo a psychological examination to obtain diagnoses that would determine possible service recommendations. Elsie again contends that DCFS should have added a service plan objective related to pharmaceutical treatment of her ADHD disorder. As we stated earlier, DCFS directed Elsie to obtain mental health counseling at Chestnut Health Services. Elsie chose not to engage in these services. Had she done so, Chestnut Health Services could have conceivably sent her to one of its licensed professionals for a psychiatric medication evaluation. Elsie made her decision not to engage in services.

¶ 61    Elsie's efforts to correct the issues that brought E.L. and P.L. into care were insufficient. Her overall progress on the service plan objectives was nonexistent during the nine-month periods from March 27, 2018, to December 27, 2018, and from December 28, 2018, to September 28, 2019. Reasonable progress is established when the trial court finds that progress " 'is sufficiently demonstrable and of such a quality' that the trial court may soon be able to order the return of the minor to the parent's custody." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47 (quoting *In re D.T.*,

2017 IL App (3d) 170120, ¶ 17). Here, Elsie was no closer to having E.L. and P.L. returned to her custody than she was in November 2013 when DCFS removed them from her home.

¶ 62    We conclude that the trial court's order finding that Elsie failed to show any progress toward correcting these conditions is not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 63                              B. Best Interest of the Children

¶ 64    Elsie did not raise any issues on appeal regarding the best interest hearing. Accordingly, we find that the trial court's decision that the best interest of the children required termination of Elsie's parental rights was not contrary to the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006).

¶ 65    While we are affirming the decision of the trial court, our opinion should not be construed as approval of the inexcusable length of time it took the trial court to arrive at that decision. These children languished in the system for nine years. There was an inexplicable timespan of over a year between the fitness hearing and the best interest hearing. Nothing in this record remotely justifies the length of time these children remained in limbo instead of obtaining permanency, which is one of the stated goals in the Juvenile Court Act. See *In re D.T.,* 212 Ill. 2d 347, 367-68 (2004). The statement of purpose and policy governing juvenile court proceedings reflects that they are time sensitive. " 'The legislature recognizes that serious delay in the adjudication of abuse, neglect, or dependency cases can cause grave harm to the minor and the family and that it frustrates the health, safety, and best interests of the minor and the effort to establish *permanent* homes for children in need.' " (Emphasis added.) *In re D.F.*, 208 Ill. 2d 223, 231 (2003) (quoting 705 ILCS 405/2-14(a) (West 2000)). "For these reasons, we direct the trial court to consider, in an expedited manner, cases involving children ***, so that the minors whose futures are at stake in these

21

proceedings can obtain a prompt, just, and final resolution of their status." *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 66                                        III. CONCLUSION

¶ 67     For the foregoing reasons, we affirm the judgments of the circuit court of St. Clair County finding that Elsie was an unfit parent, and that the best interest of E.L. and P.L. required the termination of her parental rights.


¶ 68     Affirmed.