NOTICE
Decision filed 09/11/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240589-U

NO. 5-24-0589

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* PASILEY M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-JA-284 |
| | ) | |
| Nichole L., | ) | Honorable |
| | ) | Martin J. Mengarelli, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:   In this appeal from the circuit court's orders finding the respondent an unfit parent and terminating her parental rights, the record on appeal reveals no issue of arguable merit, and therefore the respondent's appointed appellate attorney is granted leave to withdraw as counsel, and the orders of the circuit court are affirmed.

¶ 2    The respondent, Nichole L. (Nichole), appeals from the circuit court's orders that found her unfit to parent her minor daughter, Pasiley M. (P.M.), and terminated her parental rights. Nichole's appointed appellate attorney has concluded that this appeal does not present any reasonably meritorious issue and, on that basis, has filed a motion to withdraw as counsel, along with a supporting brief. See *Anders v. California*, 386 U.S. 738 (1967); *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) ("The procedure for appellate counsel to withdraw as outlined in *Anders* applies

1

to findings of parental unfitness and termination of parental rights."). The attorney served Nichole with proper notice of the *Anders* motion and a copy of the brief. This court provided her with ample opportunity to respond, but she has not done so. After examining the *Anders* motion and brief, as well as the entire record on appeal, this court concludes that the *Anders* motion is well taken. Accordingly, the *Anders* motion is granted, and the orders of the circuit court are affirmed.

¶ 3                                    BACKGROUND

¶ 4                     *The Neglect Petition and the Shelter Care Hearing*

¶ 5     This case began on October 12, 2021, when the State, pursuant to section 2-13 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-13 (West 2020)), filed a petition alleging that P.M. was a neglected minor. The petition recited that P.M. was born on August 23, 2021. Nichole was the biological mother of P.M. The legal father of P.M. was Tobyas M. (Tobyas). The petition alleged that P.M. was neglected (1) under section 2-3(1)(a) of the Juvenile Court Act (*id.* § 2-3(1)(a)), in that her parents did not provide her with adequate food or shelter, and (2) under section 2-3(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(b)), in that P.M.'s environment was injurious to P.M.'s welfare.

¶ 6     On that same day, the circuit court conducted a temporary custody hearing (see *id.* § 2-10), also known as a shelter care hearing. A guardian *ad litem* (GAL) was appointed for P.M. A lawyer was appointed for Nichole, though none was appointed for Tobyas. At the hearing's close, the court entered an order that found probable cause to believe that P.M. was neglected. This finding was based on the following facts adduced at the hearing: P.M. was hospitalized at Cardinal Glennon Children's Hospital in St. Louis from September 28, 2021, to September 30, 2021, due to failure to thrive. She gained weight while in the hospital. Upon being returned home, she began losing weight. There was no medical reason for her losing weight, and she was diagnosed with

2

"non-organic failure to thrive." P.M.'s home was found to be in "deplorable condition" with cockroach infestation and animal waste throughout the house. Based on all those facts, the court gave temporary custody of P.M. to the Illinois Department of Children and Family Services (DCFS). The court permitted supervised visitation at DCFS's discretion.

¶ 7    In early November 2021, DCFS prepared a family service plan, establishing recommended services and goals for Nichole and Tobyas, who were never married. See *id.* § 2-10.1. According to the plan, neither parent understood why P.M. was removed from the home, or why she could not be returned home immediately. The plan noted that Nichole was born on February 11, 2004. (She therefore was 17 years old at the time of the juvenile petition and at the time the family service plan was prepared.) Nichole lived with her own mother and was a student at a metro-east high school. Nichole was given goals in the areas of mental health, parenting, and education. She was to complete a mental-health evaluation and to comply with the evaluator's recommended therapy or treatment. She was to complete a parenting class and to demonstrate her improved ability to parent during visitations with P.M. She was to continue attending high school. The recommended permanency goal was for P.M. to return home within 12 months, pending her parents' compliance with the service plan.

¶ 8    Tobyas, the legal father of P.M., also had services and goals established by the family service plan. Tobyas availed himself of some of the services, for a while. However, his relationship with Nichole soon ended. Tobyas eventually stopped having any contact with DCFS; his last contact was in September 2022, less than one year after this case began. His participation in court proceedings did not continue beyond the shelter care hearing. He ultimately was found to be an unfit parent due to his abandonment of P.M. and for other reasons, and his parental rights to P.M. were terminated; he is not a party to this appeal.

3

¶ 9                    *The Adjudicatory Hearing and the Dispositional Hearing*

¶ 10    In an adjudication report filed with the circuit court in mid-November 2021, DCFS reported that Nichole "struggled greatly" with P.M. during visitation. For example, during the first visitation, the DCFS caseworker needed to step in and prepare P.M.'s baby bottle. Meanwhile, DCFS reported that P.M. had made "significant progress at her traditional foster placement."

¶ 11    In an adjudication report filed in late December 2021, DCFS reported that Nichole had been referred for a psychotherapy evaluation. She had begun parenting classes and was attending regularly. She continued to attend high school. Nichole had missed three visitations with P.M. Although Nichole did appear to "care for [P.M.]," she seemed at times "disinterested" in her. Meanwhile, P.M. continued to gain weight at her foster home.

¶ 12    On January 11, 2022, the circuit court held an adjudicatory hearing. See *id.* § 2-18(1). Nichole and her attorney appeared. The GAL appeared. The court concluded that both of the juvenile petition's allegations of neglect had been proved by a preponderance of the evidence. Then, the court proceeded immediately to a dispositional hearing. See *id.* § 2-22(1). At that hearing's end, the court made P.M. a ward of the court. Custody and guardianship were placed with DCFS, which was granted discretion to permit supervised visitation. The permanency goal of returning home within 12 months, recommended in the family service plan, was found appropriate, as were the family service plan itself and the services that were delivered to Nichole.

¶ 13                              *Permanency Hearings*

¶ 14    DCFS prepared another family service plan in mid-January 2022. The services and goals recommended for Nichole were essentially unchanged.

¶ 15    In early April 2022, DCFS filed a status report. It rated Nichole "unsatisfactory" in the areas of mental health and parenting, and "satisfactory" in terms of education. She had not yet had

a mental-health evaluation. She had taken 9 of the 10 required parenting classes that were required but "still has difficulty practicing basic parenting skills." During visitations with P.M., "she spends most of her time just holding the baby and taking pictures." She was continuing classes at her high school. DCFS noted that "[t]here are some concerns regarding Nichole's cognitive functioning. Despite the many times she has been explained the seriousness of [P.M.'s] condition at the time she came into care, she keeps putting the blame on different factors." Meanwhile, P.M., who was then seven months old, continued to do very well in her foster home.

¶ 16    In mid-April 2022, the court held its first permanency hearing, and entered its first permanency order. Under this order, the permanency goal was left unchanged, *i.e.*, return home within 12 months. The court found that Nichole had not made reasonable and substantial progress, or even reasonable efforts, toward returning P.M. home.

¶ 17    The permanency orders entered in May 2022, August 2022, and December 2022 were basically the same as the first permanency order. Nichole was found not to have made reasonable and substantial progress, or even reasonable efforts, toward returning P.M. home.

¶ 18    Status reports for the second half of 2022 continued to show "unsatisfactory" progress in the areas of mental health and parenting. In the area of education, her progress was rated "unsatisfactory" in December 2022. Nichole had transferred to a different high school when she and her father moved to a different town. (Nichole's mother had moved out of state.) At her new school, Nichole had an individualized education program (IEP) and was in special-education classes for every subject except physical education and "textile." School records from May 2022, which were included in the December 2022 status report, showed that Nichole's reading comprehension was at 1.9 grade equivalence and her math calculation and computation were at

5

3.4 grade equivalence. Meanwhile, status reports showed that P.M. continued to develop normally and to "thrive" with her foster family.

¶ 19    In a psychological assessment report, prepared in November 2022, a psychologist described his meeting with and testing Nichole in October 2022. Judging by Nichole's performance on the Wechsler Adult Intelligence Scale, Fourth Edition, the psychologist found that Nichole's full-scale IQ of 68 was "significantly below the average score and indicates the possibility of an intellectual disability."

¶ 20    In its status report of February 2023, DCFS rated Nichole's progress "unsatisfactory" in the areas of mental health and parenting, noting that "Nichole is not compliant with mental health services." Although Nichole played with P.M. during her two-hour visitations, she displayed "no ability to appropriately care for her or to meet her needs." For example, "Nichole has difficulty understanding basic directions about how much to feed her daughter, nutrition, and how [P.M.'s] needs are changing as she grows." Nichole had returned to a "satisfactory" rating in the area of education; she had completed the necessary credits for high school graduation. Meanwhile, P.M., who was one year, five months old at the time, continued to thrive in foster care. "[P.M.] is developmentally on target and meeting her milestones."

¶ 21    In March 2023, the court appointed a GAL for Nichole and entered another a permanency order, which found that Nichole had not made reasonable and substantial progress, or even reasonable efforts, toward returning P.M. home. In late May 2023, DCFS submitted a status report. Nichole's progress was rated as "unsatisfactory" in the areas of mental health and parenting; she was not participating in mental-health services because she did not see any benefit to it. Her progress was also rated "unsatisfactory" in parenting. DCFS noted that there was very little communication between Nichole and P.M. According to DCFS, Nichole "continues to be

6

inconsistent with visits" and "still lacks the basic skills and cognitive ability to keep [P.M.] safe." In the area of education, Nichole's progress was rated "satisfactory." She was scheduled to graduate, despite her reading fluency being "at a fourth-grade level." Nichole indicated that she was working. However, she lacked stable housing, moving from one motel to another. Also, Nichole had begun using marijuana on a regular basis, explaining that it was the only thing that helped her to relax. Meanwhile, P.M. was one year, eight months old and continued to progress well with her foster family.

¶ 22    On June 6, 2023, the court held another permanency hearing and entered another permanency order. Again, Nichole was found to have made no reasonable and substantial progress, and no reasonable efforts, toward returning P.M. home. After approximately 18 months in which the permanency goal had been return home within 12 months, the permanency goal was changed to "substitute care pending determination of termination of parental rights." In DCFS's status report of August 2023, it was reported that although Nichole had graduated high school, there was no real progress.

¶ 23    On August 31, 2023, the court held another permanency hearing and entered another permanency order, which restored the permanency goal of return home within 12 months. The court directed the DCFS caseworker "to provide resources for 1 on 1 parenting education" with Nichole. DCFS was also to arrange a hair follicle test for Nichole within seven days.

¶ 24                    *The Petition for Termination of Parental Rights*

¶ 25    On January 17, 2024, the State filed a petition for termination of parental rights and for the appointment of a guardian with power to consent to adoption. In regard to Nichole, the petition alleged that she was an unfit person to have P.M. because (1) she had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent

7

during any nine-month period following the adjudication of neglect, and indeed, had failed to make reasonable efforts from the adjudication of neglect on January 11, 2022, to the date of the filing of the termination petition; and (2) she had failed to make reasonable progress toward the return of P.M. during any nine-month period following the adjudication of neglect, and indeed, had failed to make reasonable progress from the adjudication of neglect on January 11, 2022, through the date that the termination petition was filed. See 750 ILCS 50/1(D)(m)(i), (ii) (West 2022); see also 705 ILCS 405/2-29(2) (West 2022) (providing for termination of parental rights by petition).

¶ 26    In February 2024, DCFS filed a status report. At that time, P.M. was two years and five months old. Nichole's progress in the areas of mental health and parenting were rated "unsatisfactory." In the area of education, she was rated "satisfactory" because she had graduated from high school; this task was discontinued. Nichole lived in Missouri with her mother and her mother's paramour, who was a sex offender. Nichole's hair follicle test was negative for illegal drugs but positive for marijuana. As for P.M., she was "bonded with her foster family" but was "showing delays in different areas." P.M. was receiving occupational therapy, physical therapy, and speech therapy. "In addition, she has been showing signs of what the doctor believes could be some sort of neurological problem." Seizures, epilepsy, and autism were possibilities. The foster parents were "overwhelmed" at one point, as P.M. had become "physically aggressive" toward her foster sister, was throwing food, and was not listening to her foster parents. The foster parents were considering "giving notice" due to thinking that P.M. might be better off in a home where she was the only child. Also, the foster parents were upset by the recent reversion in the permanency goal to return home within 12 months.

¶ 27     *Termination Proceedings: The Parental Unfitness Hearing*

¶ 28     On April 1, 2024, the court held a hearing on the parental unfitness portion of the State's petition for termination. The State called a single witness at the unfitness hearing, Celia Bankenbring, a child welfare advanced specialist with DCFS. She had worked with Nichole for about two years and had reviewed her entire file. According to Bankenbring, Nichole had been rated "unsatisfactory" for the permanency goal of return home within 12 months. In the area of parenting, Nichole's first referral for parenting classes was unsuccessful; she was unsuccessfully discharged due to poor attendance. Her second referral for parenting classes was successful; she completed the classes. A psychological evaluation of Nichole's parenting capacity had led to a recommendation of more individual one-on-one parenting, which led to another referral; this class also ended with Nichole's unsuccessful discharge, due to poor attendance. Nichole's visitations with P.M. had always been supervised, for she never had demonstrated an ability to parent P.M. on her own. Nichole was at the same stage of parenting as when this case opened, back in October of 2021, though she had made some slow and minimal progress in parenting, according to Bankenbring. Nichole had reported that she lived in Missouri, in a house that she shared with her mother and her mother's paramour, whom Nichole called her "stepdad." Nichole had been without a home for a few months prior to moving to Missouri. She never wanted any help from DCFS in regard to housing, "because she said her father was looking into it." According to Bankenbring, Nichole's mother was known to DCFS as a methamphetamine user, and her mother's paramour was a registered sex offender, having pleaded guilty in the late 1990s to sex offenses against young children. Because of this living situation, Nichole's housing was unsatisfactory, said Bankenbring, and Nichole never accepted DCFS's offer of help in finding suitable housing. In Bankenbring's opinion, Nichole was unable to parent on her own, and she should be found unfit.

¶ 29    Nichole testified on her own behalf at the unfitness hearing. As to her parenting classes, she had "messed up" the first one, but then she finished it. As for the second parenting class, she "was at the hotel" because she "didn't feel comfortable or safe" around her father, with whom she had been residing. Her father had hurt Nichole "plenty of times" when she was a child and in adulthood. On February 1, 2023, her father "tr[ied] to kill [her] in a house fire" and, at that point, she moved to Missouri, in order to live with her mother and her "stepdad." DCFS did not do anything to help her find housing, though she had asked for help many times. Nichole never told DCFS that she was unsafe. In parenting classes, she had learned how to parent P.M., and she believed that she believed that she could take good care of P.M. She had learned a lot from her parenting coach, but the one-on-one coaching did not begin until fairly recently, and she thought that if coaching continued, she could eventually parent P.M. without assistance. As for her living situation, she would never expose P.M. to anyone who might abuse or molest P.M., and she would not have moved to Missouri if she had known she would be living with a registered sex offender. At the time of the court hearing, Nichole had a job, and she planned to rent an apartment in a complex that was still under construction in Troy, Missouri.

¶ 30    At the close of the unfitness hearing, the judge stated, "The case has been open now for two and a half years, and unfortunately it seems like we're in the same starting spot as we were two and a half years ago." The judge found that the State had proved, by clear and convincing evidence, that Nichole was an unfit person to have P.M. because she had failed to make reasonable progress for the return of P.M. during any nine-month period following adjudication, specifically, that she had failed to make progress from January 11, 2022, to the date of the filing of the termination petition. See 750 ILCS 50/1(D)(m)(ii) (West 2022). Nichole did love P.M. and had

10

been making efforts toward reunification, the judge stated, but he was "unsure" whether Nichole was capable of actually making progress.

¶ 31        *Termination Proceedings: The Hearing on the Child's Best Interests*

¶ 32        The court immediately proceeded to a best-interests hearing. The State again called Celia Bankenbring as its sole witness, who testified that P.M. had had only one placement since this case began—at the Edwardsville home of her foster parents and their two adopted children, ages four and two. The foster parents had passed a background check. Bankenbring had observed P.M. at her foster home. P.M. referred to her foster parents as mom and dad, and she is "very bonded" to the foster parents and their children. P.M. had been showing "delays" and was recently diagnosed with "expressive language disorder," that is, an inability to express her thoughts, and the foster parents have taken her to all of her medical and other appointments. The home met DCFS standards, the foster parents have signed permanency commitments, and they were willing to adopt the minor. Bankenbring did not think that termination of Nichole's parental rights would harm P.M. From Bankenbring's observation, P.M. saw Nichole as someone to play with; she saw the foster parents as the people who provided her with "comfort and support." In Bankenbring's opinion, P.M.'s best interests would be served by allowing P.M. to remain with her foster parents and being adopted by them.

¶ 33        Nichole testified on her own behalf at the best-interests hearing. She said that during her twice-per-month visitations with P.M., P.M. responded to her as a child responds to her mother. If her parental rights were terminated, it would hurt P.M. because she would not know "who her real mom is. *** [S]he needs her real mom." The GAL for P.M. suggested that the best interests of P.M. would be served by having her adopted, stating that he was "very concerned" that Nichole would not be able to provide for a "special needs" child such as P.M.

11

¶ 34    At the close of the best-interests hearing, the court found that the State had proved, by a preponderance of the evidence, that it was in the best interests of P.M. and the public that Nichole's parental rights be terminated and that DCFS be vested with the power to consent to P.M.'s adoption. This decision was based primarily on P.M.'s need for permanency. "I can't leave a child in care forever hoping that things might get better," the judge explained. A secondary reason for the court's decision was the safety of P.M. The judge expressed his fear that if P.M. "gets into a dangerous situation," Nichole "might not be able to react properly."

¶ 35    The circuit court entered a written unfitness order and termination order. Nichole filed a timely notice of appeal. An appellate attorney was appointed for her.

¶ 36                                ANALYSIS

¶ 37    As previously noted, Nichole's appointed appellate attorney has concluded that this appeal lacks arguable merit and, on that basis, has filed an *Anders* motion to withdraw as counsel. Nichole has not filed any response to the *Anders* motion. In the brief accompanying her *Anders* motion, the attorney raises three potential issues in this appeal, namely: (1) whether the circuit court erred in finding that Nichole was an unfit person to have P.M. based upon her failure to make reasonable progress during any nine-month period following the adjudication of neglected minor; (2) whether the circuit court erred in finding that it was in P.M.'s best interests that Nichole's parental rights be terminated; and (3) whether Nichole was denied the effective assistance of counsel in the circuit court. For the reasons that follow, this court agrees with the appointed appellate attorney that each of these issues lacks arguable merit.

¶ 38    In regard to the first and second potential issues—that is, in regard to the orders on parental unfitness and termination of parental rights—this court will reverse the circuit court's order only if the circuit court's findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL

12

App (5th) 220793, ¶ 31. A decision is against the manifest weight of the evidence only if the opposite conclusion is apparent, or when findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 39 A person may be found unfit to have a child on any of a few different bases. See 750 ILCS 50/1(D) (West 2022). Nichole was found unfit to have P.M. on the basis of section 1(D)(m)(ii) of the Adoption Act: "Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 ***." *Id.* § 1(D)(m)(ii). The circuit court found her unfit by clear and convincing evidence. See *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 67 (2005) (a parent must be found unfit by clear and convincing evidence). On review, the circuit court's finding of unfitness "is given great deference because the court had the best opportunity to view and evaluate the parties and their testimony." *Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Nichole was found to have failed to make reasonable progress from the date of the adjudication of neglect (January 11, 2022) to the date of the filing of the termination petition (January 17, 2024), a period of just over two years.

¶ 40 "Reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). "The benchmark for measuring a parent's reasonable progress *** encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. A parent makes reasonable progress when the circuit court can find that the progress "is sufficiently demonstrable and of such a quality" that the

13

trial court may soon be able to order the return of the minor to the parent's custody. *Id.* The progress must be such that "the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 41    As the detailed factual summary of this case, *supra*, makes clear, Nichole did not make reasonable progress during the two-year period that ended with the filing of the termination petition. As Celia Bankenbring testified at the unfitness hearing in April 2024, Nichole was at the same stage of parenting as when this case opened in October 2021, when P.M. was placed into care for a failure to thrive. The circuit court found as much. The reunification of Nichole and P.M. was not a realistic expectation for the near future. Clearly, the circuit court's finding of unfitness was not against the manifest weight of the evidence.

¶ 42    The termination of parental rights is an extreme act. *Za. G.*, 2023 IL App (5th) 220793, ¶ 52. Nevertheless, after a circuit court has determined that a parent is unfit, parental rights must yield to the best interests of the child. *Id.* After the finding of unfitness, the State bears the burden of proving by a preponderance of the evidence that the termination of parental rights is in the child's best interests. 705 ILCS 405/2-29(2) (West 2022).

¶ 43    Here, the court found, based on its considerations of the relevant statutory best interest factors (see *id.* § 1-3(4.05)), that P.M.'s best interests required termination of Nichole's parental rights. By the time of the best-interests hearing, P.M. had lived most of her 2½ years with her foster family. The foster family consisted of two foster parents and their two adopted children, ages four and two, who had all bonded with P.M., and she with them. P.M. had a safe and secure home with her foster parents, who tended to her medical needs and her "special needs." The termination of Nichole's parental rights offered P.M. a sense of permanence. The court's best-interests finding was not against the manifest weight of the evidence.

14

¶ 44 In regard to the third potential issue raised in the *Anders* brief—whether Nichole was denied the effective assistance of counsel in the circuit court—this court considers the two-pronged test from *Strickland v. Washington*, 466 U.S. 668 (1984). See also *In re R.G.*, 165 Ill. App. 3d 112, 127-28 (1988) (in cases involving termination of parental rights, claims of ineffective assistance of counsel will be decided under the standards set out in *Strickland*). To succeed on a claim of ineffective assistance, a party must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) counsel's deficient performance resulted in prejudice to the party. *Strickland*, 466 U.S. at 687. Both prongs of the *Strickland* test must be met in order to prevail, and if the ineffective-assistance claim can be disposed of because the party did not suffer sufficient prejudice, a court need not consider whether counsel's performance was deficient. *Id.* at 697.

¶ 45 Here, Nichole's counsel at the termination proceedings competently cross-examined the State's witness and adequately presented the testimony of Nichole. Counsel made sure to bring out the favorable parts of Nichole's testimony (such as they were), including her participation in parenting classes and the (tiny) improvements she had made with her parenting coach. Like appellate counsel, this court cannot identify any area in which Nichole's counsel at the termination proceedings fell below an objective standard of reasonableness. As appellate counsel concludes in her *Anders* brief: "Even if trial counsel's performance would be deemed below an objective standard of reasonableness, [Nichole] was not prejudiced because, based on the record, it is difficult to see how the results of the proceedings would have been different, regardless of counsel's performance." In short, Nichole's actions and inactions in this case gave her attorney very little with which to work.

15

¶ 46                                    CONCLUSION

¶ 47    As this appeal presents no issue of arguable merit, the appellate attorney is granted leave

to withdraw, and the orders of the circuit court are affirmed.


¶ 48    Motion granted; judgment affirmed.