NOTICE
Decision filed 09/24/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250408-U

NO. 5-25-0408

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* ELLA C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-172 |
| | ) | |
| Amos C., | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's judgment terminating respondent's parental rights was not against the manifest weight of the evidence where the State met its burdens of proving that the respondent was unfit to parent and that termination was in the best interest of the minor. Therefore, the judgment of the circuit court is affirmed.

¶ 2    The respondent, Amos C., appeals from the May 9, 2025, order of the circuit court terminating his parental rights over his minor daughter. On appeal, respondent challenges both the finding of unfitness and the determination that it was in the minor's best interest to terminate his parental rights. For the reasons explained below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    This case began on August 11, 2022, when the State filed a petition for adjudication of wardship regarding respondent's minor child, Ella C., who was born in November 2021. The

1

petition named the respondent father and the minor's mother, Erin C.[1] The State alleged that Ella was neglected and abused by reason of her mother having two other minor children in the care of the Illinois Department of Children and Family Services (DCFS) due to ongoing substance abuse. The petition also included the mother's August 10, 2022, admissions that she was using drugs and that there had been domestic violence incidents involving respondent, although she stated that she had not reported the latter due to fear of his retaliation. A temporary custody order was entered on August 11, 2022, naming DCFS as the temporary guardian of Ella C.

¶ 5                          A. Adjudication of Neglect and Initial Proceedings

¶ 6      On January 30, 2023, the circuit court entered an adjudicatory order finding that the minor was neglected due to her mother's "severe relapse," which created an environment injurious to the minor's welfare pursuant to 705 ILCS 405/2-3(1)(b) (West 2022). A Court Appointed Special Advocate (CASA) permanency report filed on February 16, 2023, documented, *inter alia*, a domestic violence incident in July 2022 that occurred in the child's presence and led to respondent's arrest, as well as an instance of the mother smoking methamphetamine in the child's presence a few days later. CASA also noted ongoing concerns about domestic violence and a lack of communication with respondent and the mother, as both had been arrested for domestic battery a few days prior to the report.

¶ 7      DCFS filed dispositional reports for both parents on February 17, 2023. Respondent's report indicated that the "prognosis for reunification *** within the next five to twelve months is poor." DCFS noted that respondent "continued to engage in an unhealthy and violent relationship" with the child's mother, had a "significant history of domestic violence issues," and was suspected of abusing substances (although he would not submit to testing to confirm this). Two days after

---

[1]The minor's mother, Erin C., appealed separately and is not a party to this appeal.

his February 11, 2023, arrest for domestic battery involving the mother, respondent was charged with criminal trespass for violating a no-contact order. The report further stated that respondent failed to sign DCFS consent forms for service referrals. DCFS recommended that respondent complete domestic violence counseling, parenting education, a substance abuse evaluation, and individual counseling. DCFS further recommended that his visitation be supervised "due to the violent nature" of his relationships.

¶ 8    Following a hearing, the circuit court entered a dispositional order on April 24, 2023, making the minor a ward of the court and placing her in the guardianship of DCFS. Specific to respondent, the court found that he was unfit and unable to care for, protect, train, educate, supervise, or discipline the minor and that placement with him was against her best interests due to his domestic violence and substance abuse issues. The court further found that, while the parents had made reasonable efforts to have the minor in their home, they had not eliminated the necessity for removal, and returning the minor to their care would be contrary to her health, welfare, and safety. Both parents were ordered to cooperate with DCFS to complete the required services and correct the conditions that brought the minor into DCFS care. The court granted DCFS the discretion to allow the parents unsupervised, overnight, and/or extended visits with the minor, if appropriate.

¶ 9    DCFS filed another permanency report on October 20, 2023, in advance of the court's permanency hearing. This report was completed by DCFS child welfare specialist Pamela Kennedy, who had been assigned to both parents' cases in September 2023. As to respondent, the report indicated that he had not engaged in any of his recommended services and had not maintained any contact with DCFS, although he did attend visitation with the child. Respondent's recommended services included substance abuse treatment and random drug drops, mental health

3

services, and domestic violence perpetrator services. The report noted that he had three warrants out for his arrest at the time, and the charges included DUI and methamphetamine possession. DCFS recommended a permanency goal of returning the child home in 12 months. However, the report also noted that, as of October 2023, nine months had passed since the adjudication of neglect, and both parents showed a lack of progress in engaging in services throughout this time. The report concluded with DCFS's recommendations that both parents were to cooperate with the department and comply with the terms of their service plans, and correct the conditions that required placing the minor in substitute care.

¶ 10    A CASA report filed in advance of the hearing also indicated concern that respondent and the mother had not completed their service plans. CASA continued to have no contact with respondent, although he did maintain weekly visitation with the child. CASA agreed with DCFS that the child should remain under the guardianship of DCFS, with a permanency goal of returning home in 12 months.

¶ 11    Following a hearing, the circuit court entered a permanency order on October 25, 2023, setting a 12-month goal of returning the child to the home. The court found that neither parent had made either reasonable efforts or progress towards reunification with the minor. It further found that the service plans were appropriate and reasonable and had been communicated to the parents; however, the parents had not completed the required services. The court admonished the parents that they must cooperate with DCFS and comply with the terms of their service plans, or risk termination of their parental rights. The court set another permanency hearing for April 24, 2024.

¶ 12    Pamela Kennedy, for DCFS, completed a permanency review report that was filed in advance of the hearing. The report noted that respondent had completed a pre-assessment for parenting services following an October 19, 2023, referral and was attending classes "fairly

4

consistently," although he struggled to keep up with assignments and was "very limited in his opening up." Respondent was "cooperative with his [parenting] services," and the instructor reported that respondent had the ability to parent his child, but there were "things that he need[ed] to work on and take care of" in his personal life before he could adequately step into a parental role. The instructor indicated that the relationship between respondent and the mother "continues to be of grave concern."

¶ 13    The report also noted respondent's pending legal matters, including his pleading guilty to the methamphetamine possession charge. He had not completed a substance abuse assessment, and he failed to appear at seven scheduled drug screens. The two that he did complete resulted in adulterated screens. Respondent did not provide DCFS with an explanation for these results. Respondent told DCFS that he was engaged in online domestic violence services; however, he did not provide proof and the status and content of these services remained unclear. His visitation with the minor remained at weekly visits of one hour, and was going well. DCFS commented that respondent and the minor clearly shared a bond. DCFS had recently approved visits in the community, although home visits were "not able to occur" at the time due to both parents' lack of stable housing. DCFS maintained its recommendation that both parents continue their cooperation with the department to comply with the terms of their service plans and correct the conditions that brought the minor into DCFS care.

¶ 14    CASA also filed permanency reports for both parents. CASA remained concerned with their lack of communication and maintained its recommendation that the minor should remain under DCFS guardianship. The circuit court entered a permanency order on April 24, 2024, making the same findings regarding respondent as its prior ruling.

¶ 15                                B. Fitness Hearing

¶ 16    The State filed a motion seeking a finding of parental unfitness and termination of parental rights on May 13, 2024. The circuit court held a fitness hearing on March 14, 2025.

¶ 17    At the hearing, the court noted that respondent's service plan included recommendations for mental health, domestic violence, and substance abuse services. He had completed a mental health assessment, but, according to the testimony of Kennedy, he did not inform DCFS of his appointment, so the department was unable to obtain the required paperwork. He also completed a substance abuse assessment, at which he denied abusing any substances.

¶ 18    Neither assessment resulted in further recommendations. However, Kennedy stated that she did not believe that respondent was forthcoming about his substance use, as he had tested positive for cocaine and alcohol around the time of the latter assessment. Additionally, he pled guilty to possession of methamphetamine, and failed to appear at 32 of his 44 required drug screens. Of the remaining 12, one tested positive for cocaine, which the court stated indicated that he may have a substance abuse problem.

¶ 19    When respondent testified, he attributed any issues with his required assessments to a lack of communication from DCFS and continual issues with DCFS's referrals. Respondent also testified that he did not remember or know why he did not go to all of the assessments requested by DCFS. The circuit court expressed that it "found his testimony not credible."

¶ 20    While respondent appeared to have attended a domestic violence program, he never received a certificate. Kennedy testified that the program he attended was not one that DCFS was familiar with, and he needed to provide his certificate of completion in order for the department to determine if the curriculum met DCFS standards. Instead of a certificate, respondent provided screenshots showing that he had registered for a course, but the photos did not show that he had

6

completed it. The circuit court commented that it was unclear why respondent "kept doing that program instead of doing one that was acknowledged by DCFS."

¶ 21    Kennedy acknowledged that DCFS did review the program and determined that, had respondent provided a certificate of completion and participated in mental health services as part of this program, he would have satisfied the domestic violence portion of his service plan. Respondent testified that he did not obtain the certificate because he could not afford the $115 fee, and when he showed his records from completing the domestic violence program to DCFS, he was not given any assistance in acquiring the certificate. Upon being questioned whether he could have acquired $115 in the last six months, he responded that he "probably could have."

¶ 22    Kennedy also testified about respondent's visitation with the minor, which she described as "initially" going well. She explained that DCFS had chosen not to exercise its discretion to allow visitation beyond supervised visits at the DCFS office. She also stated that, by May 1, 2024, DCFS was not close to returning the minor to respondent's care.

¶ 23    In explaining its ruling, the circuit court referred to Kennedy's testimony that DCFS declined to afford respondent unsupervised, overnight, and extended visits with the minor, or visits in the community or home. The court acknowledged that respondent showed care and concern for the child and had "made efforts at some point in this case but not progress during the specific time periods alleged" in the State's motion. The court further recognized that respondent had completed the parenting class listed in his service plan. However, based on the court's aforementioned findings regarding the other elements of the plan, the court ruled that respondent failed to make reasonable progress over the relevant nine-month period.

¶ 24                                   C. Best-Interest Hearing

¶ 25    The circuit court next held a best-interest hearing, which took place on May 9, 2025. The court heard further testimony from Kennedy, respondent, and the minor's mother. After hearing the testimony and arguments and reviewing the evidence, the court noted that the child was placed with her grandparents and older half-siblings, and had been there for almost three years. The evidence established that she had formed a strong bond with these family members. She was also able to see her birth mother at family functions, but the best-interest report indicated that the bond she had with her mother was not a strong one. She also did not request to see her birth mother or respondent, and did not have difficulty leaving them after visitation.

¶ 26    The court found that the minor considered her foster parents to be her primary caretakers and felt a sense of attachment with them. After spending most of her life in care, she was developing her identity with her foster family, and felt that she was loved, valued, and secure in their home. The court found that her foster placement would be the least disruptive option for her, as it would provide her with the permanence she needed. Thus, the court ruled that it was in the minor's best interest to terminate respondent's parental rights.

¶ 27    On May 9, 2025, following the best-interest hearing, the circuit court entered a judgment terminating both parents' parental rights over the minor. In addition to its finding that termination was in the child's best interests, the court stated in its order that the State had proved by clear and convincing evidence that respondent failed to make reasonable progress toward the return of the minor during the nine-month periods of January 30, 2023, through October 30, 2023, and August 1, 2023, through May 1, 2024. Thus, he was an "unfit person" within the meaning of section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)). This appeal followed.

¶ 28                              II. ANALYSIS

¶ 29    On appeal, respondent argues that the circuit court's findings that he was an unfit parent and that termination of his parental rights were against the manifest weight of the evidence. We reject both contentions.

¶ 30                    A. The Circuit Court's Finding of Unfitness

¶ 31    A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act and the Adoption Act. *Id.* Pursuant to the Juvenile Court Act, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act. *Id.*; 705 ILCS 405/2-29(2); 750 ILCS 50/1(D). If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2).

¶ 32    As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
> * * *
>     (m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(m)(i), (ii).

9

¶ 33    Here, the circuit court based its unfit-person ruling on a lack of reasonable progress. Under the Adoption Act, "reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. The Adoption Act provides guidance for measuring reasonable progress as follows:

> "If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan ***." 750 ILCS 50/1(D)(m)(i), (ii);

See also *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 Ill. 2d 181, 208 (2001)) ("The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent.").

¶ 34    In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The lower court's finding of unfitness is afforded great deference because that court was best positioned to view and evaluate the parties and their testimony. *Id.* Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 35    On appeal, respondent acknowledges that the circuit court based its unfitness finding on his failure to complete additional assessments and numerous drug screens, testing positive for

cocaine, and pleading guilty to a drug charge. However, he argues that there was no evidence showing which, if any, of these reasons fell within the court's cited nine-month period of August 1, 2023, through May 1, 2024.

¶ 36    Respondent additionally argues that there is no service plan or integrated assessment in the record, and thus no evidence of what services he was to complete in order to make reasonable progress. He acknowledges that the circuit court appeared to have examined an integrated assessment and resulting service plan from 2024, but contends that no such exhibits were introduced into evidence at the unfitness hearing. Moreover, he argues that there was never any documentation of the specific services he was to complete—and thus no way to determine where he fell short. Regardless, he claims that he completed parenting and domestic violence classes and attempted to obtain mental health and substance abuse services. However, he alleges that he was unsuccessful due to DCFS's failure to provide the facility with a referral for him.

¶ 37    Respondent further contends that the State did not provide clear and convincing evidence of his failure to make reasonable progress during the first nine-month period asserted by the State. He notes that in the State's motion requesting an unfitness finding, the State alleged that he had failed to make reasonable progress in two nine-month periods: January 30, 2023, through October 30, 2023, and August 1, 2023, through May 1, 2024. The circuit court found that the State had met its burden of showing lack of reasonable progress for both periods. Respondent alleges that Kennedy, the State's only DCFS witness, took over his case in September 2023, and thus had no personal knowledge of his interactions with DCFS during the first of these two periods. He further contends that, prior to Kennedy's assignment, he made repeated unsuccessful attempts to contact DCFS. He also notes that he is not identified in either the circuit court's temporary custody orders

11

or its adjudicatory order as having caused the minor's neglect; rather, the court found that the neglect was inflicted by her mother, specifically due to "a severe relapse" of drug use.

¶ 38    Regarding respondent's claims of his alleged efforts to obtain mental health and substance abuse services and complete domestic violence and parenting courses, the circuit court heard his testimony on these points, and ultimately found him to be uncredible. One specific reason the court provided was that he denied using any substances at his substance abuse assessment, but his drug tests and methamphetamine conviction showed this to be untrue. The court additionally referenced his 32 missed drug screens. Furthermore, respondent claimed that he had no contact with DCFS prior to Kennedy's involvement with his case, despite making weekly attempts to contact the department. However, the circuit court expressed doubts about his credibility. We give deference to the circuit court's determination regarding respondent's credibility, as the court had the opportunity to observe him at the hearing, and to weigh his testimony against the State's evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 39    The question on appeal is not whether respondent made *any* progress, but rather, whether he made *reasonable* progress. Indeed, the circuit court recognized that respondent had taken some steps towards correcting the conditions that led to the minor's removal. The court noted that respondent completed a parenting course, and Kennedy testified that he appeared to have done some amount of a domestic violence course that the department would have accepted had he provided evidence of successful completion. The circuit court further acknowledged that respondent expressed care and concern for the child. However, the court ultimately found that his progress during the nine-month periods under review was objectively insufficient to return the minor to his custody. See *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17.

12

¶ 40    In light of the above, we hold that the circuit court's determination that respondent's progress was not objectively reasonable was not against the manifest weight of the evidence. As previously stated, a decision is against the manifest weight of the evidence when the opposite conclusion is apparent or the court's findings are unreasonable, arbitrary, or not based on the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Thus, we are not tasked with finding any evidence in the record indicating that respondent made some effort to progress towards reunification with the minor.

¶ 41    Regarding respondent's argument that he is not mentioned as a cause of the minor's neglect in the two orders preceding the dispositional order of April 24, 2023, making her a ward of the court, we note that this dispositional order does include a finding that respondent is, "for reasons other than financial circumstances alone," unfit and unable to care for the minor. The order indicates that this finding is based on "domestic violence, [and] substance abuse." Furthermore, the record supports the circuit court's findings. The child's mother told DCFS that there had been incidents of domestic violence involving respondent that she had not reported out of fear of retaliation; Kennedy also testified at the unfitness hearing that DCFS had received reports of domestic violence, and respondent admitted to having been a party to domestic violence cases. The circuit court was additionally presented with evidence that respondent was using drugs and was not forthcoming in disclosing his drug use or appearing for drug screens.

¶ 42    Respondent also contends that there was no service plan in place to indicate how his progress should be measured, and there is no evidence in the record showing what steps he needed to take to satisfy DCFS's requirements. We initially note that the Adoption Act does not state that a service plan must be in place in order for the court to draw any conclusions on reasonable progress. Indeed, section 1(D)(m) explicitly provides that "[*i*]*f* a service plan has been established

13

*** and *if* those services were available," then a failure to make reasonable progress "*includes* the parent's failure to substantially fulfill his or her obligations under the service plan ***." (Emphases added.) 750 ILCS 50/1(D)(m)(ii); see also *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (describing compliance with a service plan as a "benchmark" for measuring progress).

¶ 43 In addition to a service plan, the court also looks at the conditions that gave rise to the child's removal in determining whether a parent made reasonable progress towards reunification, as this would require the aforementioned conditions to be corrected. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. Here, conditions pertaining specifically to respondent included domestic violence and substance abuse. Therefore, the circuit court properly considered whether respondent had made progress in those areas in particular. Without repeating the facts of this case, we refer to our previous discussion of the court's concerns regarding his progress in those areas.

¶ 44 Kennedy testified that DCFS required respondent to complete services for mental health, substance abuse, domestic violence, and parenting, and stated that the department provided referrals for each of these services. She personally made a referral for parenting services. Respondent also admits that the circuit court received and reviewed an integrated assessment and service plan from DCFS in making its unfitness determination. Respondent was clearly aware that he was required to seek mental health and substance abuse assessments, as well as domestic violence and parenting classes, as he made certain attempts to do so.

¶ 45 The circuit court reviewed DCFS's permanency reports, which provided updates on respondent's progress in completing services following the removal of the minor. Kennedy testified that she filed a permanency report on October 20, 2023, in which she noted respondent's failure to engage in services and maintain communication with DCFS. She acknowledged that she had relied on the notes of the previous DCFS caseworker assigned to respondent's case in making

14

her report, and the circuit court was able to consider that context as well. Kennedy was also able to provide personal knowledge of respondent's visitation with the minor, stating that the department did not exercise its discretion to grant him additional visitation privileges.

¶ 46    As for respondent's argument that Kennedy could not testify to the earlier of the two nine-month periods, the circuit court was aware of when she became involved in respondent's DCFS case, and the record includes DCFS documentation covering this time. We reiterate that we do not reweigh the evidence, instead deferring to the circuit court as the finder of fact. The court ultimately found Kennedy's testimony to be more credible than respondent's. Additionally, even if we were to agree with respondent that the record lacked evidence of his progress between January 30, 2023, and October 30, 2023, the plain language of the Adoption Act states that the circuit court may consider "any 9-month period following the adjudication of neglected or abused minor" in reviewing a parent's progress. 750 ILCS 50/1(D)(m)(ii). Thus, the court's findings as to the period from August 1, 2023, to May 1, 2024, would have sufficed on their own.

¶ 47    In summary, the circuit court was able to review several DCFS which reports can be found in the record, and which detail respondent's progress towards completing services, and heard Kennedy speak on where the department remained concerned about his efforts. The circuit court also heard respondent's testimony and reviewed his exhibits. We disagree with respondent that the record was lacking in any basis, either for respondent to know what DCFS required of him, or for the court to be able to judge his progress. The record shows that the circuit court's conclusion was not against the manifest weight of the evidence.

¶ 48                    B. The Circuit Court's Best-Interest Finding

¶ 49    Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should*

15

be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 50    In making a best-interest determination, the court must consider, within the context of the child's age and developmental needs, the following factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *Id.* ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

See also 705 ILCS 405/1-3(4.05) (West 2022).

¶ 51    As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 52    On appeal, respondent admits that the circuit court found that the minor was physically safe in her foster home, had developed a sense of identity with her foster family, felt a sense of attachment to her foster parents, and felt love, value, and familiarity in the home, and that her foster placement was the least disruptive option for her. However, he argues that there was "barely any evidence" presented to support these findings, pointing to Kennedy's "brief" testimony that

16

the minor bonded with everyone in the foster home, was up to date on medical appointments, and enjoyed starting school as the sole evidence presented.

¶ 53    In contrast, he contends that his own testimony about his bond with the minor and his ability to provide for her needs, as well as the love and affection he showed towards her and the fact that he was consistent with attending visitation prior to the temporary suspension of his visitation rights, outweighed the State's evidence. He additionally argues that there was no best-interest report filed in this case, and no evidence presented that respondent lacked any necessary ability relating to parenting skills or resources. Lastly, he asserts that the minor had "clearly" developed a sense of attachment, familiarity, and continuity of affection with him due to his visitation, and respondent was clearly dedicated to being her father.

¶ 54    Initially, we note that the circuit court did indeed recognize that respondent showed care and concern for the child. However, the parent's desire to continue his parental role in the child's life is not a relevant factor at this stage. See *In re D.T.*, 212 Ill. 2d at 364. The circuit court did not err by not considering respondent's wishes, as that is not a factor in making a best-interest determination. Furthermore, to the extent that respondent testified to any relevant best-interest factor, we repeat that the circuit court is afforded deference in weighing conflicting testimony and assessing witness credibility. As we have already discussed, the circuit court did not find respondent to be credible, and we will not disturb this conclusion where nothing in the record indicates that it was unreasonable.

¶ 55    We also disagree with respondent's assertion that the State presented scant evidence to support the circuit court's findings on the best-interest factors. Kennedy testified to her personal observations of the minor in her current foster placement. Contrary to respondent's arguments on appeal, Kennedy stated that the minor had spent most of her life in care, and that her current

17

placement provided stability and permanence. The circuit court agreed that the child needed permanence in her life. Kennedy also provided testimony refuting respondent's position that the minor was bonded to him, stating that the minor felt attached to her foster parents and considered them her primary caretakers; she did not ask to see respondent and did not have difficulty leaving him after his visitation.

¶ 56    The circuit court additionally heard Kennedy's testimony that the minor had strong bonds with not only her foster parents, but with her half-sister, with whom she resided, and her half-brother, who she spent time with when he was home from college. Kennedy stated that the family was very attentive to the minor and kept her up to date on her medical needs. The minor had been with her foster family for approximately three years, and Kennedy believed that, from her observations, this placement was in her best interest. Kennedy acknowledged that the foster parents were over the age of 60, but she stated that she was not aware of any major health concerns that could interfere with their ability to care for the minor.

¶ 57    In light of the testimony presented at the best-interest hearing, we agree with the circuit court that the State met its burden of proving by a preponderance of the evidence that it was in the minor's best interest to terminate respondent's parental rights. We further find that the circuit court's determination was not against the manifest weight of the evidence, where the evidence strongly supported a finding that the relevant statutory factors came out in favor of termination.

¶ 58                                III. CONCLUSION

¶ 59    For the reasons stated, the circuit court did not err in terminating respondent's parental rights to the minor. The judgment of the circuit court is affirmed.


¶ 60    Affirmed.